**CONSUMERS UNITED INSURANCE COMPANY, Appellant,**

v.

**Robert H. SMITH, Robert P. Kogod and Charles E. Smith Management, Inc., Appellees.**

Nos. 92–CV–1496, 93–CV–16, 93–CV–61, 93–CV–277, 93–CV–280 and 93–CV–726.

District of Columbia Court of Appeals.

Argued Oct. 21, 1993.

Decided July 14, 1994.

---

David Epstein and George Miron, Washington, DC, for appellant.

William D. Nussbaum and Jonathan S. Franklin, with whom Karen M. Hardwick, Washington, DC, was on the brief, for appellees.

Charles W. Havens III, Eunice Lin Bumgardner, Washington, DC, Anthony R. Buonaguro, Reston, VA, and John Del Campo, Chicago, IL, filed an amicus curiae brief for the National Organization of Life and Health Ins. Guar. Associations, on behalf of appellant.

Michael E. Surguine, Little Rock, AR, filed an amicus curiae brief for the National Ass'n of Insurance Com'rs, on behalf of appellant.

## TABLE OF CONTENTS

Page

INTRODUCTION

I. FACTS AND PROCEEDINGS 1334

II. THE JURY'S VERDICT FOR SMITH 1337
(APPEAL NO. 92–CV–1496)

 A. Criteria for Judgment Notwithstanding the Verdict; Specific Question Presented; 1338
 Jury Instructions; Special Verdict Form

 B. Anticipatory Breach of Lease at Common Law; Measure of Damages 1340

 C. Calculation of Damages as of the Date of Breach 1341

 D. Relevance of Actual Damages During the Period Between Date of Breach and 1341
 Trial

 E. Change of Market Conditions Between Date of Breach and Trial 1343

 F. Smith's Evidence of Damages: Was it Sufficient for Recovery Under § 12.4 of the 1343
 Lease?

 1. Smith's Damages Between Date of Breach and Trial 1343

 2. Smith's Estimate of Future (After–Trial) Damages 1345

 3. CUIC's Contention that Smith's Damages Were Not Properly Discount- 1346
 ed

III. CUIC'S CHALLENGE TO SMITH'S JUDGMENTS AUTHORIZING RECOVERY OF COLLATERAL: RESPEC- 1346
TIVE RIGHTS AND PRIORITIES OF THE JUDGMENT LIEN CREDITOR AND THE DELAWARE RECEIVER

 A. Full Faith and Credit: *Clark v. Williard* (*I* and *II*) 1347

 B. Priority as Between Smith and the Delaware Receiver: CUIC's Argument Under 1348
 *Huffines v. American Sec. & Trust Co.*

 C. Priority as Between Smith and the Delaware Receiver: Smith's Argument Under 1350
 *Herman v. Siney*

 D. Application of *Herman v. Siney:* the Legal Issues 1351

 1. Creating Valid Judgment Liens on Personal Property and on Real 1351
 Property

 2. The Significance, If Any, of the Court's Role in Creating a Valid 1352
 Judgment Lien Under *Herman v. Siney*

 E. Application of *Herman v. Siney:* Smith's Judgment of Recovery Against First 1354
 American Bank

 F. Application of *Herman v. Siney:* Smith's Judgment Lien on CUIC's Connecticut 1356
 Avenue Building

 1. Summary Judgment Criteria 1356

 2. Fraudulent Conveyances: the Law 1357

 3. Fraudulent Conveyances: the Law Applied to the Facts of This Case 1357

 G. Full Faith and Credit Clause Applied to the Facts of this Case: Required Court 1359
 Permission under *Huffines v. American Sec. & Trust Co.* for Execution on
 Collateral Held by Judgment Lien Creditor Having Priority Over Delaware
 Receiver

IV. CUIC'S POLICY ARGUMENT FOR REJECTING *HERMAN V. SINEY* IN FAVOR OF ADOPTING 1362
PRINCIPLES OF UNIFORM INSURER LIQUIDATION ACT

V. SUMMARY OF DISPOSITIONS 1363

Before FERREN, STEADMAN, and KING, Associate Judges.

FERREN, Associate Judge:

In this case a Delaware insurance company, doing business in the District of Columbia, stopped paying rent and sued its landlord for rescission of the lease and for damages, claiming the landlord had fraudulently induced it to lease space in a building with dangerous asbestos-containing materials. The landlord filed a counterclaim for nonpayment of rent and related charges. The jury found in all respects for the landlord, and the trial court entered judgment on a verdict against the insurance company for $2,500,-000. In an effort to execute on its judgment and obtain a lien on a building that its judgment debtor, the insurance company, owned in the District, the landlord recorded its judgment with the District of Columbia Recorder of Deeds. (The landlord was unaware that, a few days earlier, the insurance company had transferred the building to its parent company.) The landlord also caused the court to issue a writ of garnishment of the insurance company's funds in a District of Columbia bank. Soon thereafter, the Delaware Insurance Commissioner seized the insurance company's assets pursuant to a Delaware court order that enjoined all persons (thereby including the District landlord) from asserting any claim against the insurance company's property. A few weeks later, ignoring the Delaware court's order, the landlord filed a motion in Superior Court for a judgment of recovery against the garnishee bank, seeking the insurance company's funds the landlord had garnisheed. The trial court granted the motion, and the insurance company appealed. Subsequently, the trial court held an evidentiary hearing on the validity of the insurance company's sale of its building (on which the landlord had a judgment lien) to the parent company. The court ruled that the transfer was a fraudulent conveyance and that, in any event, the landlord was entitled to pierce the so-called corporate veil to execute on the building. The insurance company noted another appeal.

Although the insurance company has raised numerous issues, this consolidated appeal presents essentially three questions requiring more than summary treatment: (1) whether, in light of the particular damages formula in the lease, the landlord presented sufficient evidence to support the $2,500,000 judgment on its counterclaim for damages for nonpayment of rent; (2) whether the landlord or the Delaware Insurance Commissioner has priority in claiming the insurance company's bank accounts and building; and (3) if the landlord has priority, whether it must apply to the Delaware receivership court for permission to enforce the judgment liens.

As to the first issue, we conclude that the trial court did not err in denying the insurance company's motion for judgment notwithstanding the verdict, even though the landlord's expert testimony did not exactly track the damages formula in the lease itself.

As to the second issue, we hold—consistent with Supreme Court authority on the Full Faith and Credit Clause—that this court's decision in *Herman v. Siney,* 190 A.2d 650 (D.C.1963), requires us to affirm the judgment granting the landlord's claim to the insurance company's building and bank accounts priority over the subsequently appointed Delaware receiver's claim, subject to remand for further proceedings to ascertain the amount of the insurance company's money the landlord's writ of garnishment reached in the bank before the Delaware court issued its seizure order cutting off the landlord's claim.

Finally, we conclude that the Full Faith and Credit Clause does not require the landlord to obtain authority from the Delaware receivership court in order to proceed further in enforcing its judgment liens in the District of Columbia. At most, the Full Faith and Credit Clause would require the landlord to seek permission for release of the collateral from a District of Columbia court, acting in the capacity of an ancillary receiver. That local receivership court, applying *Huffines v. American Sec. & Trust Co.,* 63 App. D.C. 224, 71 F.2d 345 (1934), would have authority—in the insurance company's interest—to stay, but not prevent, enforcement of

the liens. In this case, however, the insurance company has not argued on appeal, as a fallback, that the trial court should have stayed enforcement of the judgment liens under *Huffines*.

Accordingly, we affirm in all respects save for a remand to determine the amount of the insurance company's money in the bank the landlord is entitled to reach.

## I. FACTS AND PROCEEDINGS

On October 10, 1983, appellant, Consumers United Insurance Company (CUIC), a Delaware corporation, signed a ten year lease—from October 1, 1984 to September 30, 1994—for commercial office space in a building located at 2100 M Street, N.W. The building was owned by Embassy Associates, a partnership whose general partners are appellees Robert H. Smith and Robert P. Kogod, and was managed by appellee Charles E. Smith Management, Inc. (We refer to appellees, collectively, as "Smith.")

In October 1991, CUIC stopped paying its rent under the lease. As a result, in November 1991, Embassy Associates filed suit against CUIC in the Landlord & Tenant Branch (L & T No. 56768–91), seeking possession of the premises and rent owed under the lease. The following month, on December 4, 1991—before the Landlord & Tenant Branch had ruled on Smith's claim for possession and rent—CUIC filed suit in the Civil Division (No. 91–CA15359), essentially seeking rescission of the lease, return of all rent payments, and damages allegedly caused by hazardous asbestos-containing building materials (ACBMs) in the building. CUIC's complaint alleged that Smith had fraudulently induced CUIC to enter into the lease by concealing the fact of the ACBMs. CUIC also alleged that the ACBMs had created a nuisance, that Smith had been negligent, even grossly negligent, in renovating the building, and that Smith had violated other terms of the lease, including the covenant of quiet enjoyment. CUIC also moved to consolidate its action in the Civil Division

with Smith's action in the Landlord & Tenant Branch, pursuant to Super.Ct.Civ.R. 42(a).

On December 10, 1991, the Landlord & Tenant Branch issued a protective order, requiring CUIC to pay future rent into the Court Registry. On December 23, 1991, Smith filed an answer to CUIC's complaint, as well as a counterclaim against CUIC seeking damages, attorney fees, and costs for alleged nonpayment of rent. Smith also opposed CUIC's motion to consolidate its action in the Landlord & Tenant Branch with CUIC's action in the Civil Division on the ground that consolidation would frustrate the goal of the Landlord & Tenant Branch: to provide swift, summary resolution of claims for possession.

On February 6, 1992, the trial court consolidated the parties' claims and granted summary judgment for possession in favor of Smith. Two months later, in April 1992, CUIC vacated the leased premises. The consolidated jury trial on CUIC's complaint and Smith's counterclaim began on September 24, 1992.

At trial, CUIC presented evidence that the 2100 M Street building contained ACBMs. CUIC also presented testimony that, because Smith was a major commercial landlord in the Washington, D.C. area, Smith knew or should have known, by the time Smith and CUIC entered into the lease in 1983, that the building had been constructed with ACBMs. In addition, a specialist in the fields of epidemiology and risk assessment testified on behalf of CUIC that, when entering into the lease with CUIC, Smith had acted contrary to the Environmental Protection Agency's asbestos controls standards for landlords.

CUIC showed that in 1986, Smith had hired NuChemCo, a consulting firm, to determine the quantity and condition of asbestos at 2100 M Street. According to this evidence, NuChemCo had found dangerous quantities of asbestos in various parts of the building.[1] CUIC also presented evidence that, in 1987, after CUIC had contracted with Smith to renovate portions of its space in the

---

1. NuChemCo's report of April 18, 1986 indicated, for example, that "ACM [asbestos containing material] was ... found on a duct at a wet stack in the suite under construction on the 3rd floor," and that "some action needs to be taken regarding the 90% amosite ACM present above the ceilings."

building, Smith had never mentioned asbestos during any of the discussions about the renovation. Employees of CUIC testified that CUIC had remained in the building during the extensive renovation, and that a Smith employee had told them in 1987 that there was no asbestos in the building and, in any event, that the construction would not cause a health risk from disturbance of asbestos. CUIC employees further testified that large amounts of dust and debris had been released into the building during the construction and that no precautions had been taken to protect them from exposure to the debris.

CUIC's Chief Operating Officer testified that CUIC had paid rent to Smith totalling $11,999,923 since the lease term began in October 1984. She further testified that CUIC sought return of that entire sum because CUIC would not have entered into the lease if it had been told there was asbestos in the building.

CUIC argued to the jury at trial that Smith, in particular, had violated § 35.1 of the lease by not "mak[ing] its best efforts to respond to correct or repair" the asbestos condition in the building after receiving notice from NuChemCo in 1986 that the asbestos was dangerous to CUIC employees.[2] With regard to CUIC's related negligence claim, CUIC asked the judge for a negligence per se jury instruction based on its allegation that, during the 1987 renovation, Smith had violated Occupational Safety & Health Administration (OSHA) regulations prescribing asbestos standards. The trial court, however, declined to give the requested instruction, instructing the jury instead that a violation of OSHA regulations may be some evidence of negligence.

In support of its counterclaim at trial, Smith relied primarily on the testimony of two witnesses. The first, Sarah Hood, Smith's property manager for 2100 M Street, testified that she oversaw the general management of the building, including the building's finances. She testified that she had

deposited CUIC's October 1991 rent check as usual but that the bank had returned it unpaid because of a stop payment order from CUIC. Hood further testified that, beginning with October 1991, CUIC remained in the building without paying rent or utility expenses. According to Hood, CUIC did not move out of the leased space until March 31, 1992, six months after it stopped paying rent and utility expenses.

Hood then testified that between March 31, 1992, when CUIC moved out of the building, and October 1992, the time of trial, Smith had been able to relet only a small part of the space which CUIC had vacated. One of CUIC's subtenants, Co'op America, had signed a new seven month lease, and two other short-term tenants had remained in part of CUIC's space. Hood then explained, with the help of a chart, her calculation of damages to which Smith was entitled under the lease for the one-year period from October 1991 through September 1992—from the date of CUIC's breach to the end of the month before trial.

Smith's second witness, James Creedon, its Vice President, testified that he was responsible for finding tenants to occupy the space in 2100 M Street after CUIC had vacated the building at the end of March 1992. Creedon testified that in its effort to re-let the space to new tenants, Smith had listed it with information services, sent mailings to brokers, given tours of the property, and offered incentives to brokers to bring in potential tenants. Creedon then explained his calculation of the damages CUIC owed Smith for the two-year period from October 1, 1992, through September 30, 1994—from the time of trial through the end of the agreed lease term.

On October 6, 1992, the jury returned a unanimous verdict in favor of Smith on all claims presented at trial. More specifically, the jury indicated on a court-supplied special verdict form that it had found in Smith's favor on CUIC's claims for breach of contract, negligence, gross negligence, fraudu-

---

2. Section 35.1 of the Smith/CUIC lease provided: Landlord will make its best efforts to respond to correct or repair any dangerous or hazardous situation or condition of which Landlord has received written notice pursuant to section 1.10(b). [Section 1.10(b) provides the Landlord's address, to which notice should be sent.]

lent concealment, and fraudulent inducement.[3] The jury also found in Smith's favor on its counterclaim for breach of the lease and awarded Smith $2,500,000 in damages. CUIC moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial; the court took the motion under advisement.

Following imposition of the judgment, CUIC filed an Emergency Motion for Stay of Execution of Judgment Pending Decision on Motion for Judgment Notwithstanding the Verdict. The court granted CUIC's emergency motion, staying execution of the judgment pending its disposition of the motions for j.n.o.v. and a new trial, on the condition that CUIC post a supersedeas bond. On October 29, 1992 the court denied CUIC's motions for postjudgment relief; CUIC noted an appeal from the judgment and from denial of its judgment notwithstanding the verdict motion (No. 92–CV–1496).

The following day, counsel for both parties discussed a possible agreement under which Smith would withhold execution on its judgment pending settlement discussions. At that time, CUIC's counsel did not inform Smith's counsel that CUIC was in the process of transferring all of its liquid and tangible assets out of the District of Columbia or that CUIC was considering transferring a building it owned in the District, located at 1714 Connecticut Avenue, N.W., to its parent holding company, Consumers United Group, Inc. (CUG). On November 2, 1992, CUIC representatives met with the Delaware Insurance Commissioner and with other representatives from the Delaware Department of Insurance to discuss the sale of CUIC's Connecticut Avenue building to CUG in exchange for a promissory note secured by the building and by stock in Consumers Computer Services, Inc. (CCSI), a wholly owned CUG subsidiary. The next day, November 3, CUIC transferred the building to CUG in exchange for a promissory note valued at $1,650,000; the note was secured by a deed of trust on the building and by all of the CCSI stock.

On November 4, 1992, Smith, unaware that CUIC had sold its Connecticut Avenue building to CUG, began efforts toward satisfying its judgment against CUIC by recording the judgment with the District of Columbia Recorder of Deeds. On November 5, Smith moved the court for release of the protective order funds that CUIC had deposited into the court registry in lieu of paying rent. The court granted Smith's motion on December 2, and CUIC noted an appeal (No. 93–CV–16).[4] Also on December 2, the court ruled that Smith was entitled to recover attorney's fees from CUIC attributable to Smith's efforts to repossess the leased premises and obtain damages. CUIC also noted an appeal from this ruling (No. 93–CV–280).[5]

On November 13, 1992, Smith served interrogatories and a writ of attachment on Ben, Inc., a tenant in CUIC's building at 1714 Connecticut Avenue. Ben, Inc. answered the interrogatories and ultimately satisfied a condemnation judgment against it in the amount of $8,812.85.[6] Also on November 13, Smith

---

3. The special verdict form did not include a question pertaining to CUIC's nuisance claim, and that is not an issue on appeal.

4. The trial court released the protective order funds to Smith "in partial satisfaction of the judgment [in favor of Smith] entered in this matter on October 8, 1992." In light of our affirmance of the trial court's judgment in favor of Smith, we affirm the trial court's order releasing the protective order funds to Smith (No. 93–CV–16).

5. CUIC has not pursued its appeal from the trial court's order of December 2, awarding attorney's fees to Smith (No. 93–CV–280). Because all of CUIC's appeals have been consolidated, and because "assignments of error ... not argued in appellant's brief [are] consider[ed] abandoned," Watwood v. Credit Bureau, Inc., 97 A.2d 460, 462

(D.C.1953); see also Smith v. Pickford, 66 App. D.C. 206, 209 n. 6, 85 F.2d 705, 708 n. 6 (1936), we affirm the trial court's order on appeal.

6. Smith served a second writ of attachment on Ben, Inc. on December 24, 1992. CUG, CUIC's parent holding company which had purchased CUIC's Connecticut Avenue building on November 3, challenged Smith's second attachment on the ground that CUG, not CUIC, owned the building at that point. The trial court issued an order dated February 5, 1993, taking CUG's motion under advisement pending an evidentiary hearing on the validity of Smith's second attachment. The court also ordered Ben, Inc. to deposit its rental payments with the court pending resolution of the matter. The writs of attachment served on Ben, Inc. are not at issue in this appeal.

served on CUIC's bank, First American, a set of interrogatories and a writ of attachment against all credits held in CUIC's name. Three days later, on November 16, First American answered that it was holding $319,423.62 for CUIC. For reasons that are unclear in the record, First American later amended its answer to show it was holding $516,577.24 for CUIC.

On November 17, 1992, responding to an ex parte request from the Delaware Insurance Commissioner, a Delaware Chancery Court issued a Seizure and Injunction Order, granting the Commissioner "possession and control of the property, assets, business and affairs of Consumers United," and "enjoin[ing] and restrain[ing] [all persons] from asserting any claim against the Commissioner or Consumer United's property." [7]

On December 8, 1992, Smith sought CUIC's funds in the District of Columbia by moving for a judgment of recovery against First American Bank pursuant to Super.Ct.Civ.R. 69–I(e).[8] The Delaware Insurance Commissioner entered an appearance and opposed Smith's motion on the ground that Smith's November 13 attachment of CUIC's funds held by First American could not prevail against the later November 17 Delaware Chancery Court Seizure and Injunction Order. On January 5, 1993, the trial court ruled that Smith's earlier attachment had priority over the later Delaware order and granted Smith's motion for judgment of recovery; CUIC noted an appeal (No. 93–CV–61).[9]

The following day, on January 6, 1993, the Delaware Insurance Commissioner filed in Superior Court a Motion Stating Claim to Attached Properties, to Vacate Writs of At-

tachment and to Rescind Condemnation Judgments. The Commissioner challenged, among other things, certain attachments that Smith had served after the November 17 Seizure and Injunction Order of the Delaware Chancery Court. The trial court denied the Commissioner's motion on January 28, 1993, and CUIC noted its appeal from the court's order (No. 93–CV–277).[10]

On February 5, 1993, the trial court ordered an evidentiary hearing to adjudicate the validity of CUIC's sale of its Connecticut Avenue building to its parent holding company, CUG. Two months later, on April 9, Smith moved for summary judgment, arguing that it was entitled to execute on CUIC's Connecticut Avenue building to satisfy its judgment because (1) the purported transfer of the building to CUG was a voidable fraudulent conveyance in violation of D.C.Code § 28–3101, and (2) Smith, in the alternative, was entitled to "pierce the corporate veil" to execute on the building in CUG's hands. The court agreed with both of Smith's arguments and ruled, in a detailed order dated May 3, 1993, that Smith was entitled to void the transfer of the building to CUG and, in any event, was entitled to pierce the corporate veil to execute on the building in CUG's hands. CUIC noted an appeal (No. 93–CV–726).

## II. THE JURY'S VERDICT FOR SMITH (APPEAL NO. 92–CV–1496)

 CUIC contends the trial court erred in denying its motion for judgment notwithstanding the verdict because Smith failed to prove damages in the terms prescribed by the lease.[11] Specifically, CUIC

---

**7.** On February 9, 1993, the Delaware Chancery Court extended its control over CUIC by issuing a Rehabilitation and Injunction Order.

**8.** A judgment of recovery is a separately executable judgment obtained directly against a garnishee. *See* Super.Ct.Civ.R. 69–I(e).

**9.** On December 24, 1992, Smith had obtained a Judgment of Condemnation against CUIC's credits in the hands of First American totalling $516,-577.24.

**10.** CUIC has not pursued this appeal, and thus we affirm the trial court's order (No. 93–CV–277). See *supra* note 5.

**11.** CUIC also contends the trial court erred in declining to instruct the jury that, if it found Smith had violated OSHA regulations during renovation of the building, that violation was negligence *per se*. This contention fails. That kind of instruction for an OSHA regulation is limited to claims by employees against their employers, since only employees, not tenants or others, are within the class of persons such regulations are intended to protect. *See Thoma v. Kettler Bros., Inc.,* 632 A.2d 725 (D.C.1993). Furthermore, CUIC's negligence claims must fail in any event because CUIC failed to present evidence of injury proximately caused by Smith's alleged negligence.

points to the Recovery of Damages provision of the lease, § 12.4, and argues that Smith did not present evidence at the trial that properly addressed the two components of the damages calculation: fair market value of the lease and present value of the rent reserved under the lease.[12] CUIC asserts that in calculating damages, Smith failed (1) to present evidence of an objective appraisal of fair market value of the lease on the date of CUIC's breach and (2) to discount damages to their present value as of the date of

CUIC further maintains the trial court erred in denying its motion for judgment notwithstanding the verdict on its breach of contract claim: that Smith violated § 35.1 of the lease by failing to use "its best efforts to respond to a dangerous or hazardous situation or condition" (asbestos) of which Smith had received written notice through the 1986 NuChemCo report. See *supra* note 1. We find no error because Smith presented evidence, sufficient to sustain the jury's verdict, that CUIC had not suffered damage from the asbestos and, in any event, that any such damage CUIC may have suffered did not result from Smith's alleged breach of the lease. More specifically, CUIC sought as damages for Smith's breach the return of all rental payments it had made under the lease because, as CUIC alleged, Smith's breach had reduced the market value of the leased space. CUIC presented evidence, for example, that the presence of asbestos made it difficult to sublease portions of its space in the building. Smith disputed CUIC's evidence of damages by showing, for example, that, in the middle of 1991, CUIC had received market rate offers from potential subtenants who had full knowledge of the asbestos conditions in the building and that many of CUIC's subtenants remained in the building even after CUIC had left. The jury, therefore, could have found, based on the contrasting evidence, either that CUIC had not suffered any damage or that any damage CUIC had suffered had not resulted from Smith's alleged breach of the lease. Furthermore, even if the jury found that Smith had breached the lease, the jury reasonably could have rendered a verdict in favor of Smith on this claim because the special verdict form—to which CUIC did not object—did not request separate determinations of liability and damages. The jury reasonably could have found that, even if Smith had breached the lease, its breach did not "cause[] Consumers United to suffer damages."

12. Section 12.4 of the lease provides:
**Recovery of Damages.** Any damage or loss of rent sustained by the Landlord may be recovered by the Landlord, at the Landlord's option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been ascertained by successive relettings, or, in a single proceeding deferred until

CUIC's breach, both as required by § 12.4 of the lease.

**A.** *Criteria for Judgment Notwithstanding the Verdict; Specific Question Presented; Jury Instructions; Special Verdict Form*

■ By moving at trial for a directed verdict and for judgment notwithstanding the verdict, CUIC preserved for appeal its argument that Smith did not present evidence sufficient to sustain the jury's verdict.[13]

the expiration of the term of this lease (in which event tenant hereby agrees that the cause of action shall not be deemed to have accrued until the date of expiration of said term), *or in a single proceeding prior to either the time of reletting or the expiration of the term of this lease, in which event Tenant agrees to pay Landlord the difference between the present value of the rent reserved under this lease on the date of breach, discounted at ten percent (10%) per annum, and the fair market value of the Lease on the date of breach.* In the event Tenant becomes the subject debtor in a case under the Bankruptcy Code, the provisions of this section 12.4 may be limited by the limitations of damage provisions of the Bankruptcy Code. (Emphasis added.)

13. CUIC argued as follows at trial, after all the evidence had been presented and before the court discussed with the parties the verdict form and instructions:
THE COURT: [A]re you making a motion for a directed verdict?
[CUIC'S COUNSEL]: Yes I am, Your Honor, on four counts.
THE COURT:—as well as on the counterclaim. I therefore am going to let it all go to the jury, both the—
[CUIC'S COUNSEL]: Is the Court of the view that I have adequately protected my record without giving you any reasons? I am happy not to put any reasons on the record.
THE COURT: I tell you what, if you can do it in one sentence, it always helps.

\* \* \* \* \* \*

[CUIC'S COUNSEL]: On the directed—plaintiff's request for a directed verdict for liability for breach of contract, all of the evidence is that paragraph 35.1 was violated including the evidence that came from the landlord itself. *On the question of directed verdict on the counterclaim that results from if the lease was violated, then there was no breach available here in October of 1991.*
On negligence per se, all the evidence on rebuttal from experts, that is the 1987 renovation violated applicable OSHA regulations which applied to tenants and that that is a required finding of negligence. *And the ques-*

While normally the jury is the trier of fact, a trial court may "remove from jury consideration those cases in which the facts, viewed most favorably to the nonmoving party, permit but one reasonable conclusion as to the proper judgment." *District of Columbia v. Cassidy*, 465 A.2d 395, 397 (D.C.1983) (quoting *Faniel v. Chesapeake & Potomac Tel. Co.*, 404 A.2d 147, 150 (D.C.1979)). The court may apply this standard by entering a directed verdict or a judgment n.o.v. *See id. Rich v. District of Columbia*, 410 A.2d 528, 532 (D.C.1979). In reviewing the denial of a judgment n.o.v., " 'this court must view the evidence and all reasonable inferences in the light most favorable to the party who obtained the jury verdict' and must reverse 'only if no juror could reasonably reach a verdict for the opponent of the motion.' " *Cassidy*, 465 A.2d at 397 (quoting *Marcel Hair Goods Corp. v. Nat'l Sav. & Trust Co.*, 410 A.2d 1, 5 (D.C.1979)); *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979).

The specific question presented, therefore, viewing the evidence in the light most favorable to Smith, is whether Smith offered sufficient evidence at trial to support the jury's $2,500,000 verdict, given (1) the terms of the lease (which was in evidence), (2) Smith's two witnesses on damages, and (3) the trial court's very general jury instruc-

tions on Smith's counterclaim—to which CUIC did not object.[14]

The trial court instructed the jury as follows:

> Now Smith's counterclaim. Smith claims that [CUIC] breached the lease and is seeking damages for that breach. Smith claims that the part of the lease that was breached was the rental payments part, that is [CUIC] stopped paying rent and Smith says this was a breach of the lease and they are entitled to damages.

The court later supplied a "special verdict form," to which CUIC did not object, see *supra* note 14, which asked two questions with respect to Smith's counterclaim: "Do you find that Consumers United breached its lease with Embassy Associates [*i.e.*, Smith]?" If so, "How much in damages do you award Embassy Associates [*i.e.*, Smith]?"

These instructions and the special verdict form left the jury with wide discretion to calculate and award damages for nonpayment of rent. While it is true that counsel, in preserving CUIC's sufficiency argument for appeal, claimed "there's no evidence that the damage computation testified to by the defense [and counter-plaintiff] bears any reasonable relationship to the lease requirements," *supra* note 13, counsel did not prof-

---

*tion of computation of damages, there's no evidence that the damage computation testified to by the defense, bears any reasonable relationship to the lease requirements. And therefore, the jury has no basis on which to award damages.*

(Emphasis added.)

**14.** Because CUIC did not object to the trial court's instructions on Smith's counterclaim, CUIC cannot challenge those instructions on appeal. *See Griffith Consumer Co. v. Spinks*, 608 A.2d 1207, 1209 n. 4 (D.C.1992) (errors raised for first time on appeal are not grounds for reversal unless apparent from face of record that miscarriage of justice has occurred); *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.*, 414 A.2d 834, 839 (D.C.1980) (same); Super.Ct.Civ.R. 51 ("No party may assign as error the giving of or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.").

Moreover, CUIC's motions for a directed verdict and for a judgment notwithstanding the ver-

dict did not preserve for appeal any objection to the trial court's instructions on the issue of Smith's counterclaim. *See Ceco Corp. v. Coleman*, 441 A.2d 940, 947 (D.C.1982) (to preserve objection to jury instructions, party must bring to trial court's attention grounds of objection so court is clearly advised as to question of law involved); *see also Universal Computers, Ltd. v. Datamedia Corp.*, 653 F.Supp. 518, 529 (D.N.J. 1987), *aff'd*, 838 F.2d 1208 (3d Cir.1988) (defendant precluded from objecting to instruction for first time on motion for j.n.o.v. or for new trial because defendant made no objection to instruction before jury retired).

Furthermore, because CUIC did not object at trial, CUIC also is precluded from objecting on appeal to the questions on the court's special verdict form relating to Smith's counterclaim. *Cf. Nimetz v. Cappadona*, 596 A.2d 603, 608 (D.C.1991) ("defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury").

fer, or ask the trial court to draft, jury instructions that referred to the "lease requirements," specifically the damages provision, § 12.4. See *supra* note 12. It is true that evidentiary sufficiency, analytically, is not dependent on or governed by jury instructions. On the other hand, if there is sufficient evidence of damages and the jury instructions are not precise, the jury's verdict is entitled to considerable deference in evaluating the limits of a permissible award simply because the jury has not been given much concrete guidance.

## B. Anticipatory Breach of Lease at Common Law; Measure of Damages

At common law, when a lessee abandoned the premises and refused to pay any more rent—sometimes called an "anticipatory breach" of the lease or a "breach by anticipatory repudiation"—the lessor had available two basic courses of action: refuse to accept the surrender, let the property lie idle, and sue for the rent as it came due; or accept surrender of the premises, thereby terminating the lease, and immediately sue for damages. *Sagamore Corp. v. Willcutt*, 120 Conn. 315, 180 A. 464, 465 (1935).[15] Under the latter approach, the lessor was entitled, as of the date of breach, to the most accurate possible calculation of damages attributable to a period wholly in the future, *i.e.*, the balance of the lease term. An old federal district court decision aptly summarized the common law approach to calculating damages under the second alternative:

It is well settled that the proper measure of damages presently recoverable by a lessor under a lease for years, from the lessee therein, on an abandonment constituting a breach thereof by the lessee, is the *present value* of the difference between

■ the fair rental value, at the time of such breach, of the leased premises for the balance of the unexpired term and [2] the total agreed rent for such unexpired term. *Leo v. Pearce Stores Co.*, 57 F.2d 340, 341 (E.D.Mich.1932) (emphasis added); *see Garcia v. Llerena*, 599 A.2d 1138, 1143 (D.C. 1991).

Because damages are payable as of the date of judgment in a lump sum, rather than as they accrue over the balance of the lease term, the *Leo* court recognized that the total of such future damages must be reduced or discounted to the "present value" of receiving that sum over time. *Leo*, 57 F.2d at 341. This means that both the balance of the agreed rent yet unpaid on the date of breach and the fair rental value of the lease on the date of breach—which are to be compared in order to ascertain changes—represent sums calculated for a future period but discounted to present value. *See Vibrant Video, Inc. v. Dixie Pointe Assocs.*, 567 So.2d 1003, 1004 (Fla.Dist.Ct.App.1990); *Taylor Publishing Co. v. Systems Mktg., Inc.*, 686 S.W.2d 213, 217 (Tex.Ct.App.1984).

Because Smith filed its counterclaim for nonpayment of rent before expiration of the lease, Smith invoked the measure of damages summarized above from *Leo*, which is specified in § 12.4 of the lease. See *supra* note 12. More specifically, Smith relied on the particular measure of damages in § 12.4 reflecting "the difference between [1] the present value of the rent reserved under this lease on the date of breach, discounted at ten percent (10%) per annum, and [2] the fair market value of the Lease on the date of breach." *Supra* note 12.[16] Put somewhat more simply, this means that Smith was entitled to the difference between the total amount CUIC promised to pay under the

---

**15.** The lessor also had a middle ground: retake possession without accepting surrender of the lease, relet the premises, and apply the rentals to the defaulting lessee's account, recovering from that original lessee "the balance of the rent due under his [or her] lease less the rent received from the new lessee." *Sagamore Corp.*, 180 A. at 465.

**16.** The words "fair market value of the Lease on the date of breach" (in the last sentence of § 12.4) incorporate a discount rate, although

presumably that rate will reflect market conditions at the time of the breach, not necessarily the 10% rate the parties negotiated in the lease to discount the balance of the reserved rent. If the 10% rate used to discount the rent reserved is greater than the discount rate used to ascertain fair market value on the date of breach, then the damages will be less than under *Leo*, where presumably the same discount rate was to be applied in calculating each sum used to compute damages.

lease for the balance of the rental period after the breach (discounted at 10% per year), and the total amount Smith could reasonably expect to receive for that entire period upon reletting the premises after the breach (discounted to reflect present market value). If, for example, CUIC had defaulted on payment of a sum which, when properly discounted, totaled $10,000 for the balance of the term, and Smith could reasonably be expected to relet the premises from the date of the breach for no more than $8,000, representing present (*i.e.*, discounted) fair market value of the lease for that same period, Smith's discounted damages would be $2,000. If, however, Smith could reasonably be expected to relet for a sum which, when discounted to the date of breach, would total $10,000 or more, not a lesser amount such as the $8,000, there would be no damages.

### C. *Calculation of Damages as of the Date of Breach*

Conceptually, all damages as of the date of breach are prospective, and yet the trial on damages will typically take place several months (or even years) later. This means there will be a pretrial period for which actual damages can be ascertained, as well as a post-trial period of future damages. Accordingly, in a variety of situations, courts have commonly recognized two separate calculations of damages beginning, as the case may be, from the date of injury or breach: (1) the damages actually realized before trial, and (2) the damages for the period after trial calculated on the basis of estimates discounted to the date of trial. *See Deakle v. John E. Graham & Sons,* 756 F.2d 821, 828–29 (11th Cir.1985) (lost wages for partial disability); *In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979,* 644 F.2d 633, 642–44 (7th Cir.1981) (wrongful death); *Taylor Publishing,* 686 S.W.2d at 216–17 (anticipatory breach of lease).

This two-part analysis is apparently justified in the theory that, because accurate damages can be ascertained for the period between breach and trial, such actual damages should not be ignored in favor of a calculation for that period based on a less exact, hindsight estimate as though no prova-ble damage had yet occurred. In short, under this approach the damages are a combination of actual pretrial damages and predicted post-trial damages, the latter being a sum discounted to the date of trial.

Section 12.4 of the Smith–CUIC lease specifically calls for calculation of all damages as of the date of the breach. See *supra* note 12. Smith's evidence of damages, however, reflected the more typical bifurcated approach: (1) actual pretrial damages and (2) estimated post-trial damages, discounted to the date of trial. We therefore confront this question: Can Smith's proof of damages at trial be said to equal the total damages that would have been calculated, as § 12.4 requires, by using entirely prospective estimates from the date of breach, discounted to the date of the breach? This inquiry spawns two subsidiary questions: (1) Because the damages that accrue during the period between breach and trial are not discounted, will such use of actual damages improperly inflate the damages awardable for that period? (2) Because real estate market conditions can dramatically change over-night, can one say that actual damages for the period between breach and trial will equal the damages calculable on the basis of estimates for that period entirely as of the date of the breach, before any market change occurs?

### D. *Relevance of Actual Damages During the Period Between Date of Breach and Trial*

As to the first question, there is no flaw in using actual damages for the period between breach and trial, without a discount, and then calculating the present value of future damages by discounting them only to the date of trial. Normally, any discounting for the earlier, "actual damages" period should be offset by crediting the lessor with interest to compensate for the pretrial period of delay in receiving the judgment. *See Deakle,* 756 F.2d at 833–34; *In re Air Crash,* 644 F.2d at 645–46; *Taylor,* 686 S.W.2d at 217.

A wrongful death case helps explain why this is true. In *In re Air Crash,* the jury was instructed to calculate the present value of all damages as of the date of·death, rather than as of the date of trial a year later,

because the evidence gave life expectancy and income estimates as of the date of death. *See In re Air Crash*, 644 F.2d at 643. The court stressed, however, that the award would be unduly low without an adjustment for the delay between the date of death (as of when damages were ascertained) and the date of trial (when a recoverable judgment was entered). *See id.* at 644. The court accordingly concluded that, in order "to adjust an award that represents 'present value at date of death' when it is actually received at the date of judgment," the factfinder must "add one year of 'interest' to 'present value of death' in order to reverse the extra year of discounting (assuming, as we do, that the 'interest rate' and 'discount rate' are the same)." *Id.* The court continued:

> [T]he reasons for augmenting these "past losses" are exactly the same as those for discounting "future losses".... "[I]f it be only fair to discount sums paid now on account of future loss which would not be due until some years in the future, ..., it is, by the same token, inequitable not to make appropriate compensation for delay in discharging the obligation."

*Id.* (quoting *Moore–McCormack Lines, Inc. v. Richardson*, 295 F.2d 583 (2d Cir.1961), *cert. denied*, 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962)); *see Deakle*, 756 F.2d at 833 (same).

The Supreme Court has cited and applied the *In re Air Crash* analysis in an action for damages under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 904. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) (lost wages for perma-

nent disability). The Court opined that, rather than calculating pretrial and post-trial damages separately in such cases,

> [i]t is both easier and more precise to discount the entire lost stream of earnings back to the date of injury—the moment from which earning capacity was impaired. The plaintiff may then be awarded interest on that discounted sum for the period between injury and judgment, in order to ensure that the award when invested will still be able to replicate the lost stream.

*Id.* at 538 n. 22, 103 S.Ct. at 2551 n. 22 (citing *In re Air Crash*, 644 F.2d at 641–46); *see Deakle*, 756 F.2d at 833.[17] The United States Court of Appeals for the Eleventh Circuit, in *Deakle*, emphasized that, for the Supreme Court's approach in *Pfeifer* to work, the discount rate and the interest rate applied to the period between injury and judgment, should be the same. *See Deakle*, 756 F.2d at 833; *In re Air Crash*, 644 F.2d at 644 & n. 19.

It follows from this case law that if damages are calculated from the date of injury—or, as in the present case, from the date of breach—reflecting a discount for the period before trial as well as for the period thereafter, that discounted value, in order to approximate actual damages, must be augmented by crediting the plaintiff with interest for the period between breach and trial (judgment); otherwise, there will be no compensation for the delay in receiving damages for that pretrial period. Because the interest rate theoretically should be the same as the discount rate, *see In re Air Crash*, 644 F.2d at 644, those two factors, once applied, cancel each other out.[18] Accordingly—with one signifi-

---

**17.** In *Deakle*, the court, relying on *Pfeifer*, summarized:

> Ideally, the stream of lost future income would begin with the date of Deakle's injuries, with no distinction being made between lost past wages and lost future wages. The next step would be to total the discounted installments and then add "interest" to the entire sum for the period between the date of injury and the date of trial. The "interest" is added to account for the fact that none of the already discounted annual installments which Deakle will receive has earned any interest during the years prior to trial.

*Deakle*, 756 F.2d at 833.

**18.** This pretrial interest imputed to offset a discount, under the terms of the lease, to the date of breach is part of the damages computation solely for the period before trial; it is not a recognition of statutory prejudgment interest, which is not at issue here. *See* D.C.Code § 15–109 (1989) (prejudgment interest statute, allowing jury to "include[ ] interest as an element in the damages awarded, if necessary to fully compensate the plaintiff"); *see also House of Wines v. Sumter*, 510 A.2d 492, 499 (D.C.1986) (prejudgment interest allowed where "necessary to fully compensate the plaintiff"). If prejudgment interest were expressly awardable, it would apply to total damages calculated to the date of breach—as theoretically explained in *Deakle*, see *supra* note 17—

cant exception—the result of calculating total damages from the date of breach, as § 12.4 requires, see *supra* note 12, will be the same as if the factfinder calculated actual damages, without a discount, for the period from breach to trial, and then calculated future damages discounted to the trial date. The exception is this: If actual market conditions during the period between breach and trial materially differ from those used to calculate damages as of the date of breach, actual and estimated damages may significantly differ for that period—a possibility to which we now turn.

### E. *Change of Market Conditions Between Date of Breach and Trial*

In cases of wrongful death, *e.g., In re Air Crash,* or of permanent disability, *e.g., Pfeifer,* there obviously can be no actual damages attributable to a worker's post-injury, pretrial work experience. However, in cases of partial disability, *e.g., Deakle,* or of anticipatory breach of a lease, an employee's actual work experience or a lessor's actual reletting efforts after the injury or breach, respectively, may reflect damages that do not square with an entirely prospective calculation as of the date of the injury or the breach.[19] Accordingly, if a lease—as in this case—requires a prospective calculation of all damages from the date of the breach, an unexpected down-turn in the real estate market could create actual damages during the period before trial that exceed the damages awardable for that period under the lease. *See Leo,* 57 F.2d at 340 (real estate values declined 25% to 30% between 1929 and 1931).[20] Absent a material change in the real estate market, however, between breach of the lease and the date of trial, damages

calculated prospectively from the date of breach, theoretically, should equal actual damages during the pretrial period.

### F. *Smith's Evidence of Damages: Was it Sufficient for Recovery Under § 12.4 of the Lease?*

With this background we turn to the evidence. To establish damages, Smith presented testimony from two witnesses, Hood and Creedon, who testified, respectively, about calculation of damages for the two different periods after CUIC's breach, pretrial and post-trial. Hood testified about the proper calculation of damages for the one-year period from October 1991 through September 1992—from the date of CUIC's breach through the month ending immediately before trial. Creedon testified as to the calculation of damages for the two-year period from October 1, 1992, through September 1994—from the time of the trial through the end of the agreed lease term. Essentially, therefore, Smith called Hood to testify about the damages—primarily the lost rent—accrued to date, and called Creedon to testify as to the damages attributable to future anticipated losses.

#### 1. *Smith's Damages Between Date of Breach and Trial*

Hood explained her calculation of accrued damages with the help of a large chart. For the period of October 1991 through September 1992, the chart summed CUIC's rent, taxes, operating expenses, utility charges, and late fees—all payable by CUIC under the lease. Because CUIC remained in possession without paying rent during the six months between October 1991 and March 1992, Smith could not have relet the premises

---

reduced by interest already imputed to calculate actual pretrial damages.

**19.** In *Deakle,* the court relied on the employee's actual work experience after his injury, compared to the wages he expected before the injury, to calculate actual damages between injury and trial. Apparently, no one questioned that particular methodology. *See Deakle,* 756 F.2d at 829.

**20.** Suppose, for example, that the damages as of the date of the breach were projected to be $1,000 for the ensuing year, premised on an analysis showing that the real estate market,

based on current projections, would yield that much less than the reserved rent if the lessor had to relet. Then suppose that six months later the real estate market dramatically fell because of perceived overbuilding coupled with a general economic downturn, resulting in the lessor's actually losing $2,000 instead of the projected $1,000. Actual damages, therefore, would exceed the $1,000 damages calculated under the lease formula by another $1,000. If, on the other hand, the market unexpectedly turned up during the period between breach and trial, actual damages would be less than those estimated as of the date of breach.

during that period. During the next six months after CUIC had left, three of CUIC's subtenants remained, and Hood credited CUIC for subtenant rent that Smith had received in CUIC's absence. Hood testified as to the basis for most of the numbers on the chart and also explained to the jury why some of the expenses changed from month to month. The chart reflected that CUIC owed Smith a total of $2,150,386.55 in damages for the period from the date of the breach to the time of trial. This figure reflected neither a discount to the date of breach nor interest to compensate for delay between breach and judgment.

In testifying about damages to date, Hood did not refer specifically to the difference between the "rent reserved under this Lease on the date of breach" or to the "fair market value of the Lease on the date of breach," the language used in § 12.4 of the lease. See *supra* note 12. But Smith correctly argues that, for the period between the breach and the trial, Hood in effect addressed the difference between the rent reserved and the fair market value during that portion of the lease term. She took CUIC's rental obligation over that period ("rent reserved") and deducted the amounts Smith actually received as rent for CUIC's space after the breach.

Hood, of course, in calculating the difference between the "rent reserved" for that year and the rents actually received, had to make a credible showing that the rents Smith actually collected reflected fair market value, *i.e.*, all the rent that Smith reasonably could have expected to receive under the

circumstances. CUIC does not claim that she failed to do so; CUIC presented no rebuttal evidence that the rents Smith received were lower than what Smith could have obtained through reasonable efforts to mitigate damages by reletting the premises during the period before trial.

Furthermore—and this is crucial—CUIC offered no evidence to rebut Smith's prima facie case by showing that the real estate market dropped off during this pretrial period, such that the actual damages demonstrated by Hood would have exceeded the damages calculable for that period, prospectively, as of the date of the breach pursuant to § 12.4 of the lease.[21]

■ In sum, we agree with Smith that, under § 12.4 of the lease, fair market value for a period that has already elapsed can be ascertained not only (1) by calculating that value wholly prospectively, as of the time of the breach, by reference to rental values of comparable property (increased by interest to compensate for the period before judgment), but also (2) by calculating actual damages for that period, as Smith has demonstrated in this case. The actual damage calculation would have been subject to rebuttal by a showing that an unforeseeable downturn in the real estate market made the actual damages too high for that period, because the lease requires calculation of damages based on estimated market value as of the date of breach. But CUIC offered no rebuttal.[22] See *supra* note 21. We therefore

21. Although Smith had the burden of proving damages, Smith met its evidentiary burden for the pretrial period by proving, through Hood's testimony, a prima facie case of actual damages between the date of breach and the date of trial. The burden of producing evidence to the contrary shifted to CUIC, which made no such showing. *See Brewer v. Drain,* 192 A.2d 532, 534 (D.C.1963) (after plaintiff meets burden of introducing evidence to establish prima facie case, burden shifts to defendant to come forward with evidence to mitigate or abate damages); *Brooks v. Capital Fleets,* 123 A.2d 916, 917 (D.C.1956) (once plaintiff establishes prima facie case of damages, defendant had burden of going forward with any evidence he or she may have had to mitigate or abate damages); *Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 240 U.S.App.D.C. 88, 98, 743 F.2d 932, 942 (1984) ("Once a *prima facie* case of damages has been established by the

claimant, the burden of production shifts to the opponent to go forward with evidence tending to mitigate or abate the damages or to undermine the credibility of the claimant's case."). Specifically, CUIC offered no testimony to prove that damages calculated for the pretrial period as of the date of the breach, as called for by the lease, would have materially differed from the actual damages proved by Smith through Hood's testimony. If CUIC had offered such rebuttal evidence, this would not necessarily have proved Smith's evidence insufficient for a verdict, although it could have served as the basis for a remittitur if it was credible and uncontradicted and the jury obviously did not take it into account.

22. CUIC did present·evidence that the presence of asbestos in the building had reduced its fair

conclude—contrary to CUIC's contention—that Hood sufficiently accounted for "fair market value of the Lease on the date of breach" by deducting from her "rent reserved" calculation the amounts Smith actually received as rent during the period about which she testified.

### 2. Smith's Estimate of Future (After–Trial) Damages

■ Creedon also explained his calculation of future (post-trial) damages with the help of a chart. Creedon testified that he had estimated for purposes of his calculations that the space would be left completely vacant for a period of approximately eleven months from the date of the trial. This estimate was based on Creedon's previous experiences with tenants similar in size to CUIC unexpectedly breaking their leases.[23] Creedon then explained that he had calculated damages in two parts. He testified that he had calculated damages for the first four months—for the period from October 1992 through January 1993—simply by adding "the four months rent that was owed to us ... [and] discount[ing] the money owed [at] ten percent a year ... [as] specified in the CUIC lease." These four months represented the first four of the eleven months that Creedon estimated the space would remain vacant. See *supra* note 23. Damages for the first four months totalled $712,155.12. Creedon then explained his damages calculation for the remaining twenty months of the lease—for the period from February 1993 through September 1994. Creedon testified that he had calculated these damages by taking "the difference in the present value amounts of what [Smith] would have received had [CUIC] stayed through their lease term [and subtracting] what [Smith will] receive now since they left early and [Smith will] have to release the space." According to this estimate, damages for the final twenty months would total $1,367,950.48. Finally, Creedon testified that the total damages for CUIC's breach—covering the period about which Hood testified and both periods about which Creedon testified—amounted to $4,230,492.15.

In making his estimates, Creedon defined fair market value of the premises. Initially, he noted that fair market value is "the value of, in this case, the space on an open competitive market." The fair market value of the property during the eleven months for which Creedon estimated the building would remain vacant was therefore zero since, according to Creedon's assumptions, Smith was not likely to rent the space during that time. *See Thomas v. Amoco Oil Co.*, 455 So.2d 1187, 1193 (La.Ct.App.1984); *Look v. Werlin*, 590 S.W.2d 526, 527 (Tex.Ct.App.1979). Creedon accordingly calculated damages for these eleven months by taking the present value of CUIC's rental obligations under the lease and deducting zero for the "fair market value of the Lease." See *supra* note 12. Next, as to the final twenty months of the lease term (including the first eleven months discussed above), for which the "fair market value of the Lease" was zero, Creedon explained that Smith's damages were "the difference in the *present value* amounts of what [Smith] would have received had they stayed through their lease term versus what [Smith will] receive now since they left early and [Smith will] have to release the space." (Emphasis added.) In short, Creedon addressed the "fair market value of the Lease" in his damages calculation for the final twenty months of the lease term by properly subtracting from the present (*i.e.*, discount-

market value, but this evidence did not reflect trends in the real estate market as such that would have affected Smith's estimates of the fair market value of the lease. Smith's damages witnesses testified as to the amount of rent Smith was likely to receive in CUIC's absence, and this evidence presumably reflected any reduction in the fair market value of the building resulting from the presence of asbestos.

**23.** CUIC has not contended at trial or on appeal that Creedon, in anticipating a period of vacancy, used an improper factor. CUIC therefore

implicitly conceded that proper calculation of "fair market value of the Lease on the date of breach" could include a reduction for the predictable fact that efforts to relet the premises are not likely to be successful for awhile. *See Look v. Werlin*, 590 S.W.2d 526 (Tex.Ct.App.1979) (because landlord made diligent effort to relet but had been unable to do so at time of trial, and court found that premises would likely remain unrented for balance of lease term, court could conclude that premises had no market value).

ed) value of the agreed rent the present value of the amount that Smith was likely to receive from reletting the space.

### 3. CUIC's Contention that Smith's Damages Were Not Properly Discounted

CUIC contends that, even if Smith's witnesses properly netted reserved rent against fair market value, Smith's evidence was insufficient because Hood and Creedon failed to take the next required step: to discount damages to their present value as of the date of CUIC's breach. According to CUIC, the jury therefore could not properly calculate, as of the date of the breach, either the "present value of the rent reserved" or the "fair market value," as required by § 12.4 of the lease. See supra note 12. See Universal Computers Ltd. v. Datamedia Corp., 653 F.Supp. 518, 528–29 (D.N.J.1987) (burden on plaintiff to produce evidence of present value), aff'd, 838 F.2d 1208 (3d Cir.1988).

It is true that Hood's testimony, establishing the damages actually incurred over the one-year period between breach and trial, were not discounted to show the value of that sum as of the date of the breach. But, as we explained earlier, the failure to discount here would ordinarily have to be offset by an interest credit in the same amount, see Deakle, 756 F.2d at 833; In re Air Crash, 644 F.2d at 644 & n. 19, to account for delay in awarding accrued damages. CUIC has never suggested that the § 12.4 calculation was not to be offset by interest for pretrial delay. Furthermore, as we previously have noted, CUIC did not offer rebuttal evidence to prove that undiscounted actual damages for the period before trial differed materially from the damages that would have been calculated wholly prospectively for that period as of the date of breach. See supra note 21.

■ CUIC also is correct that Creedon discounted damages to the date of the trial, not to the date of the breach. But as already explained, once actual pretrial damages have been proved, the balance of the damages shall be discounted only to the date of trial, since those damages pertain only to the post-trial period. See Deakle, 756 F.2d at 832–34; Look, 590 S.W.2d at 528.

Given the documentary and testimonial evidence presented, viewed in light of the very general language of the jury instructions on damages—to which CUIC did not object, see supra note 14—we sustain the trial court's refusal to grant a judgment n.o.v. on CUIC's sufficiency-of-evidence challenge. The testimony of Smith's witnesses clearly was sufficient to demonstrate the difference between the value of the rent reserved and the fair market value of the lease during the period between breach and trial. The testimony also demonstrated the difference between the value of the rent reserved for the balance of the term and the fair market value of the lease for that period, discounted to the date of trial. It is important to realize that Smith presented evidence that CUIC's obligations under the lease totalled $4,230,492.15. The jury, however, awarded Smith damages of $2,500,000. We cannot justify undoing the judgment.

### III. CUIC's Challenge to Smith's Judgments Authorizing Recovery of Collateral: Respective Rights and Priorities of the Judgment Lien Creditor and the Delaware Receiver

We turn now to Smith's efforts to satisfy its judgment (Appeal Nos. 93–CV–61, 93–CV–726). CUIC contends the trial court erred in (1) refusing to give effect to the Delaware Chancery Court's November 17 Seizure and Injunction Order, (2) granting Smith's motion for judgment of recovery against First American Bank, and (3) ruling that Smith was entitled to void the sale of CUIC's Connecticut Avenue building to its parent holding company, CUG, and further ruling that, in any event, Smith could pierce the corporate veil to execute on the building in CUG's hands.

To address CUIC's contentions, we must answer the following question: To what extent does the appointment of a receiver for a Delaware insurance company by a chancery court in Delaware—a state which has enacted the Uniform Insurers Liquidation Act

(UILA)[24]—prevent a judgment creditor from executing on the insurance company's property located in the District of Columbia?

## A. *Full Faith and Credit: Clark v. Williard (I and II)*

We begin our analysis with two Supreme Court cases dealing with Article IV, § 1 of the Constitution: the Full Faith and Credit clause. In *Clark v. Williard*, 292 U.S. 112, 54 S.Ct. 615, 78 L.Ed. 1160 (1934) (*Clark I* ), Williard, trustee of a syndicate, filed suit in a Montana court against Federal Surety, an Iowa insurance company, to recover damages due upon a bond. Shortly after Williard brought suit but before he had obtained a judgment, an Iowa court issued a decree of dissolution against Federal Surety, adjudging the Iowa Commissioner of Insurance, E.W. Clark, to be "the successor to said company." Williard then obtained a judgment against Federal Surety in the Montana court and began efforts to satisfy the judgment by filing a petition for leave to execute against securities and moneys owned by Federal Surety, which had been discovered in Montana. Clark, the foreign liquidator, opposed Williard's petition, asserting his title as successor to the dissolved corporation. The Montana trial court agreed with Clark and ruled that Federal Surety's assets should be liquidated and ratably distributed subject only to liens existing at the date of dissolution in Iowa. Williard appealed, and the Montana Supreme Court reversed, ruling that Clark "was not the successor to the corporate personality" but was merely a "chancery receiver with a title (if any) created by the Iowa decree." *Id.* at 117, 54 S.Ct. at 617. The court then held that, "as against such a receiver, creditors in Montana were at liberty to levy attachments and executions, irrespective of their right to enforce such a levy against a statutory successor." *Id.* The United States Supreme Court reversed and remanded, holding that "the Supreme Court of Montana denied full faith and credit to the

statutes and judicial proceedings of Iowa in holding ... that [Clark] was a receiver deriving title through a judicial proceeding, and not [a statutory successor]." *Id.* at 121, 54 S.Ct. at 619. The Court, however, remanded the case for the Supreme Court of Montana to determine whether Montana had a local policy "whereby an insolvent foreign corporation in the hands of a liquidator with title must submit to the sacrifice of its assets or to their unequal distribution by writs of execution." *Id.* at 129, 54 S.Ct. at 622. According to the Supreme Court, if Montana had such a policy, then the Montana courts could allow Williard, the judgment creditor, to execute against the assets of Federal Surety. If, on the other hand, Montana law provided that a court-appointed Montana liquidator was entitled to priority over judgment creditors, then the Montana courts would be required to accord that same priority to Clark, the foreign liquidator, and thus could not allow Williard to execute against Federal Surety's assets.

On remand, the Montana Supreme Court held that the local policy of Montana permitted attachments and executions against insolvent corporations, foreign and domestic, and that this rule prevailed against statutory successors clothed with title to the assets, just as much as it prevailed against corporations themselves or against chancery receivers.[25] Clark again appealed to the United States Supreme Court, which affirmed the Montana Supreme Court in *Clark v. Williard*, 294 U.S. 211, 55 S.Ct. 356, 79 L.Ed. 865 (1935) (*Clark II* ). The Court held in *Clark II* that, although "[e]very state has jurisdiction to determine for itself the liability of property within its territorial limits to seizure and sale under the process of its courts," *id.* at 213, 55 S.Ct. at 357, the Full Faith and Credit Clause establishes that:

> Iowa may say that one who is a liquidator with title, appointed by [Iowa] statutes, shall be so recognized in Montana with whatever rights and privileges accompany

---

**24.** Uniform Insurers Liquidation Act, 13 U.L.A. 321, 328–53 (Master ed. 1986). Delaware has enacted the UILA at Del.Code Ann. tit. 18, §§ 5901(2) to (13), 5902, 5903, 5913 to 5920 (1989).

**25.** The Montana Supreme Court then determined that, under Montana law, Williard was entitled to bring proceedings to execute against Federal Surety's assets even after the Iowa court had appointed the foreign liquidator.

such recognition according to Montana law. For failure to give adherence to that principle we reversed and remanded when the case was last before us. Iowa may not say, however, that a liquidator with title who goes into Montana may set at naught Montana law as to the distribution of Montana assets, and carry over into another state the rule of distribution prescribed by the statutes of the domicile.

*Id.* at 215, 55 S.Ct. at 358.

■ Thus, under *Clark I* and *Clark II*, the District of Columbia must (1) recognize the status of a foreign receiver, as established by foreign law, and (2) accord that foreign receiver the same rights and privileges against judgment creditors, seeking to levy against assets in the District of Columbia, that the District would accord the same kind of receiver if appointed locally in the District of Columbia. We therefore must determine the rights, under District of Columbia law, to which a District of Columbia receiver of an insurance company is entitled vis-a-vis judgment creditors.

### B. Priority as Between Smith and the Delaware Receiver: CUIC's Argument Under Huffines v. American Sec. & Trust Co.

CUIC contends that District of Columbia law gives an insurance company receiver an absolute priority over a lien asserted in the District, even when the lien was created before the receiver was appointed.[26] CUIC argues, in the alternative, that if the law of the District of Columbia does not give insurance company receiverships priority over pending liens, this court as a matter of policy should afford such priority to insurer receiverships by giving effect to the principles incorporated in Delaware's version of the Uniform Insurer Liquidation Act (UILA). See *supra* note 24.[27] Specifically, this would

mean (among other things) that, upon the commencement of a so-called delinquency proceeding against a troubled insurer requiring appointment of a receiver, any action to attach, garnishee, or execute upon the debtor's property would be stayed automatically pending further order of the court, and that any lien obtained within four months of the commencement of the proceeding would be held void. DEL.CODE ANN. tit. 18, § 5919 (1989).

Smith argues, to the contrary, that under District of Columbia law, a judgment creditor who has attached the debtor's assets in a bank, or has recorded a judgment lien against the debtor's real property, has priority over the claims of a subsequently appointed receiver for the debtor. Smith also disagrees with CUIC's alternative contention that we should give effect to Delaware's version of the UILA. Smith stresses that the District of Columbia, having adopted neither the UILA nor even the UILA's reciprocality provisions, must be said to have rejected UILA principles.

CUIC and Smith point to different case law to support their respective arguments. CUIC contends that *Huffines*, 63 App.D.C. at 224, 71 F.2d at 345, is controlling here. In that case, Huffines brought suit against American Security & Trust Co. to set aside a sale of property on the ground that Huffines, who held a second deed of trust on the property, had not received adequate notice of the sale. Before the sale, the National Benefit Life Insurance Company, an insurance company in receivership, owned the property subject to two deeds of trust; American Security held the first deed of trust while Huffines held the second. The notes secured by American Security's first deed of trust had been overdue and unpaid, and American Security had therefore petitioned for the court's permission, in the insurance company's receivership proceeding, to sell the property to

**26.** CUIC's Receiver, Donna Lee H. Williams, filed a brief to address the issues in appeal No. 93–CV–61, and CUIC's Consolidated Supplemental Brief incorporates by reference the Receiver's brief.

**27.** CUIC's argument that this court, as a matter of policy, should adopt the principles of the Delaware UILA is not an argument based on choice

of law theory; *i.e.,* CUIC does not say we are bound on the facts here to yield to Delaware law. Rather, CUIC is saying that, if we do not conclude that the District's substantive case law grants priority to the Delaware receiver, this court as a matter of policy, in interpreting the District's common law, should adopt UILA principles and apply them to this case.

satisfy the notes. The court granted American Security's request, and the sale proceeded at public auction. Huffines subsequently argued on appeal that the sale should be set aside because, as holder of the second deed of trust, he had received inadequate notice of the sale. The United States Court of Appeals for the District of Columbia Circuit concluded, first, that Huffines' notice would not have been adequate if the property had been sold at a "judicial sale," but that his notice would have been adequate, under the terms of his deed of trust, if the sale essentially had been private, in execution of American Security's deed of trust. The court then concluded that the sale had been of the latter type, "made by the trustee under the authority and according to the terms of the deed of trust," *Huffines*, 63 App.D.C. at 227, 71 F.2d at 348, and that the notice Huffines had received, therefore, had been adequate. The court further stated that American Security had petitioned the court for permission to conduct the sale only because National Benefit Life Insurance Co., the owner of the property, was in receivership. *See id.* The court then added that, even though the receiver had taken charge of the property, American Security's petition had not made the sale a judicial sale. *See id.* The court elaborated:

> This conclusion is not inconsistent with the action of the trust company and trustee under the first deed of trust in applying to the court in the receivership case for leave to proceed with a sale of the property. It was provided by the terms of the decree entered by the lower court in that case, as well as by the established principles of the law, that, after the court had taken possession through its receiver of the property of the defendant in the case, it was not permissible for a creditor holding a lien upon any of the impounded property to begin or carry on proceedings for the sale thereof for the payment of his debt. Only by permission of court could such a sale be made. In this instance the creditor and the trustee who otherwise would have made sale of the property under the authority of the deed of trust without the intervention of the court, were compelled to apply to the court wherein the receivership case was pending for leave to make sale of the property for the purpose of paying the indebtedness secured by the deed of trust. The application for such permission was made by the trustee to the court and was granted. Whereupon the trustee was free to make sale of the property under and according to the terms of the deed of trust and this he did. This action did not convert the sale into a judicial or court sale. The sale was not made by the court, nor by officers acting under its orders. No application was made to the court for an order confirming the sale when made. No proceedings were had such as would be necessary were the sale a judicial sale (section 95 and § 521 et seq. D.C.Code 1924 [D.C.Code 1929, T. 25, § 206, and § 191 et seq.]; Rules of the Supreme Court of the District of Columbia, Equity Rules 68 et seq.). The entire proceeding was had under and according to the deed of trust alone.
>
> Moreover, it was unnecessary that Huffines should be made a party in the receivership case. No relief was sought against him in that case. The only result secured by the action of the trust company and the trustee in the receivership case was simply an order permitting them to proceed under the deed of trust free from the control of the court. This permitted of a sale as if no receivership proceeding had been had and no receiver appointed.

*Id.*

Relying on this language, CUIC argues that under District of Columbia law, if a judgment creditor has attached, or recorded a judgment lien against, the property of an insurance company in receivership, the creditor cannot take the property without permission of "the court wherein the receivership case was pending," *id.,* even if the attachment or lien had been created before the insolvency order was issued. CUIC then argues that, by virtue of such authority, CUIC's Delaware receiver was entitled to claim priority over Smith's postjudgment liens, even though they predated the receivership. According to CUIC, therefore, the trial court should not have granted Smith's motions for judgment of recovery and for

summary judgment, respectively allowing Smith to execute on CUIC's assets in the bank and voiding CUIC's sale of its Connecticut Avenue building to CUG and authorizing Smith to execute upon it.

██ Before turning to Smith's counterargument, it is important for us to note that CUIC merges—and thus confuses—two issues. It is one thing to say that a judgment lien creditor may not dispose of the debtor's property until a receivership court grants permission; it is quite another thing to say that the receiver has a paramount claim to the property even though the creditor obtained a judgment lien before the receiver was appointed. Under *Huffines*, the fact that the receivership court had authority to withhold permission for a secured creditor to sell the mortgaged property apparently amounted to no more than authority to grant a temporary stay of the exercise of the creditor's rights, in order to give the debtor some breathing room in dealing with all the creditors; it did not mean, in addition, that the receiver could seize the property for the insolvent's estate over the claim of a prior secured creditor. Indeed, the *Huffines* opinion made clear that the receivership court was ultimately obliged to grant permission for the sale "under the deed of trust free from the control of the court[,] ... as if no receivership proceeding had been had and no receiver appointed." *Id.* In other words, whatever legal basis there may have been for

requiring receivership court permission for the sale,[28] *Huffines* established that the receivership court itself must recognize the right of the creditor to execute upon the security interest by way of a private sale. This means, in effect, that under District of Columbia law, a court supervising an insurance company receivership ultimately must enforce the substantive rights of judgment lien creditors whose liens attached before appointment of the receiver.

## C. *Priority as Between Smith and the Delaware Receiver: Smith's Argument Under Herman v. Siney*

The question then becomes, who has priority: the judgment lien creditor or the receiver? Smith contends that this court's decision in *Herman*, 190 A.2d at 650, recognizes Smith's priority over the Delaware receiver. In *Herman*, Siney and Oney, the creditors, obtained default judgments in the Municipal Court against the Union Storage and Transfer Company. The court issued writs of garnishment to reach funds in Union Storage's bank, and the creditors filed motions for condemnation of the funds held by the bank to satisfy the judgments. Before the court held a hearing on the condemnation motions, the United States District Court for the District of Columbia appointed Herman as Union Storage's receiver. Herman filed an opposition to the condemnation of the

---

28. In *Huffines*, the court order appointing the receiver said, with reference to all insurance company property: "all persons to whom knowledge of its contents may come, are restrained and enjoined from interfering with the possession and administration of said property by said receiver." *Huffines*, 63 App.D.C. at 225, 71 F.2d at 346. Through *Huffines*, therefore, we have recognized the general rule that, "[w]hile a prior lien is not affected by the appointment of a receiver over the property, a lien creditor may not disturb the possession of the court without its permission." *Edmiston v. J.C.G. Medallion, Inc.*, 570 S.W.2d 306, 310 (Mo.Ct.App.1978). Court permission for American Security's sale under the deed of trust, therefore, was necessary to assure that American Security was not an unsecured creditor, as well as to give the insurance company time to deal with all its creditors, secured and unsecured, in an orderly way. More specifically, the receivership court, in exercising discretion whether to lift the stay on disposition of the debtor's collateral, considers the following factors, among others: (1) whether a short "breathing spell" would ultimately benefit the debtor, its creditors, and, in the case of an insurance company, its policyholders, *see Wheeler v. Walton & Whann Co.*, 65 F. 720, 723 (D.Del. 1895); 1 RALPH E. CLARK, THE LAW AND PRACTICE OF RECEIVERS § 74 (3d ed. 1959) (hereafter CLARK ON RECEIVERS); *cf.* 1 COLLIER BANKRUPTCY MANUAL § 362.01 (3d ed. 1994) (discussing analogous automatic stay under Bankruptcy Act); (2) whether delay in foreclosing would be inequitable when there is little, if any, possibility the debtor can pay and delay will expose the lienholder to serious risk of loss in a declining market, *see Stahl v. Peerless Spring Mfg. Co.*, 13 F.2d 262 (E.D.Pa. 1926); 1 CLARK ON RECEIVERS § 976, and (3) whether the stay will be, or has become, inequitable in other ways considering the lien creditor's right of absolute priority to the property; *see National Surety Corp. v. Sharpe*, 236 N.C. 35, 72 S.E.2d 109, 123 (1952); 65 AM.JUR.2d *Receivers* § 168 (1964).

garnisheed funds, but the trial court granted the creditors' motions. On appeal, this court affirmed:

> "A receiver derives his authority from the act of the court appointing him ... and the utmost effect of his appointment is to put the property *from that time* into his custody...." The Municipal Court first acquired jurisdiction over the property by garnishment which vested that court with power to hear and determine all controversies relating thereto and disabled the District Court from exercising like power. The receiver was appointed in a suit to which the appellees were not parties and after the garnishment had been completed in the Municipal Court. The appointment of a receiver, therefore, did not divest the lien acquired by the garnishment.

*Id.* at 651–52 (footnote omitted) (quoting *Union Nat'l Bank of Chicago v. Bank of Kansas City*, 136 U.S. 223, 236, 10 S.Ct. 1013, 1017, 34 L.Ed. 341 (1890)).

Relying on *Herman*, Smith contends that District of Columbia law gives priority to a judgment lien creditor over a receiver, where the receiver was appointed after the judgment creditor's lien on the property had attached. Smith argues, therefore, that the trial court correctly granted judgment of recovery in favor of Smith against CUIC's assets held by First American and, further, properly ruled that Smith could execute on CUIC's Connecticut Avenue building, either by voiding the transfer of that building to CUG as a fraudulent conveyance or by piercing the corporate veil and recovering the property from CUG itself.

■ We agree with Smith that, as to priority of claims, *Herman* is controlling here. Interpreting substantive law, *Herman* confirms that a judgment creditor's claim to property to satisfy a debt will have priority over a subsequently appointed receiver's claim to that property if a court already has assumed jurisdiction over the property for the creditor's benefit by authorizing, for example, an attachment or garnishment. But this rule of law suggests two unanswered questions on this record.

First, if a judgment creditor (Smith) (1) obtains a writ of garnishment from the court and levies on the garnishee, or (2) records the judgment with the Recorder of Deeds and thereby creates a lien against the realty, will that judgment creditor (Smith) have sufficiently invoked court protection in the District of Columbia, within the meaning of *Herman*, to give its lien priority over claims by the debtor's (CUIC's) subsequently appointed receiver in a foreign jurisdiction (Delaware)?

Second, if the answer to the first question is "Yes,"—*i.e.*, if *Herman* gives the judgment lien creditor's (Smith's) claims priority over those of the Delaware receiver—is that priority affected by the *Huffines* requirement that even a secured creditor must obtain permission from a receivership court before seizing or selling the collateral?

These questions suggest a possibility that neither party entertains: that both *Herman* and *Huffines* may be applicable here instead of one or the other.

### D. Application of Herman v. Siney: the Legal Issues

We begin with the first question: whether, under *Herman*, Smith has priority over the Delaware receiver's claim to CUIC's bank accounts at First American and to CUIC's Connecticut Avenue building.

#### 1. Creating Valid Judgment Liens on Personal Property and on Real Property

The threshold issue under *Herman* is a legal one: what steps must a judgment creditor take in order to obtain a valid lien on a debtor's property that is entitled to priority over a subsequently appointed receiver? We note initially that the procedure for acquiring a lien on personal property in the hands of a garnishee is different from the procedure for acquiring a lien on real property.

■ In order to reach personal property of a debtor held by a third party, a judgment creditor must—following entry of judgment—request the court to issue a writ of attachment. *See* D.C.Code § 16–542 (1989). The judgment creditor must then "serv[e] the garnishee with a copy of the writ of

attachment and of the interrogatories accompanying the writ." D.C.Code § 16–546 (1989). Service of the writ on the garnishee creates a valid lien in favor of the judgment creditor on the debtor's property held by the garnishee. Obtaining the property held by the garnishee, however, is an entirely separate matter, which typically involves the following additional procedures.

■ Upon receipt of the writ of attachment, the garnishee is required to file answers to the interrogatories that accompany the writ. Within twenty-eight days following receipt of the garnishee's answers, the judgment creditor must request condemnation of the funds held by the garnishee. JOSEPH SPERLING, POSTJUDGMENT EXECUTION IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA 3 (3d ed. 1990) (hereafter SPERLING ON POSTJUDGMENT EXECUTION). If the garnishee fails to answer the interrogatories accompanying the writ, or if the garnishee answers the writ but fails to send money to the judgment creditor, the judgment creditor should file a motion for judgment of recovery against the garnishee, see *supra* note 8. *See* D.C.Code § 16–556 (1989); Super.Ct.Civ.R. 69–I(e). Thus, although steps in addition to serving a writ of attachment may be required to obtain the property of the debtor held by the garnishee, the judgment creditor has a valid lien as of the date the writ is served on the garnishee.

■ In contrast, in order to reach a debtor's real property, a judgment creditor must—following entry of a judgment in the debtor's favor—"file[ ] and record[ ] [the judgment] in the office of the Recorder of Deeds of the District of Columbia." D.C.Code § 15–102(a) (1989).[29] The act of filing the judgment with the Recorder of Deeds "shall constitute a lien on all the freehold and leasehold estates, legal and equitable, of the defendants bound by such judgment." *Id.* To execute against the debtor's realty, the lienholder must show proof to the clerk of the court that the judgment was recorded, and the clerk will then issue a writ of *fieri facias* and send the writ to the marshal. SPERLING ON POSTJUDGMENT EXECUTION at 13. The writ of *fieri facias* can be used to "lev[y] on all legal leasehold and freehold estates of the debtor in land." D.C.Code § 15–311 (1989).[30] Thus, the judgment creditor's lien on the debtor's real property is valid as of the date the judgment is recorded in the office of the District of Columbia Recorder of Deeds, even though further court procedures may be required to obtain or sell the debtor's realty to satisfy the lien (just as a motion for judgment of recovery may be necessary to recover funds from a garnishee).

## 2. The Significance, If Any, of the Court's Role in Creating a Valid Judgment Lien Under Herman v. Siney

The next legal question under *Herman* is more subtle: whether the fact that the Municipal Court had assumed jurisdiction over

**29.** D.C.Code § 15–102 provides:

(a) Each—
(1) final judgment or decree for the payment of money rendered in the United States District Court for the District of Columbia, or the Superior Court of the District of Columbia, from the date such judgment or decree is filed in the office of the Recorder of Deeds of the District of Columbia, and
(2) recognizance taken by the United States District Court for the District of Columbia, or the Superior Court of the District of Columbia, from the date of the entry or order of forfeiture of such recognizance is filed and recorded in the office of the Recorder of Deeds of the District of Columbia,
shall constitute a lien on all the freehold and leasehold estates, legal and equitable, of the defendants bound by such judgment, decree, or recognizance, in any land, tenements, or hereditaments in the District of Columbia, whether the estates are in possession or are reversions or remainders, vested or contingent. Such liens on equitable interest may be enforced only by an action to foreclose.
(b) Liens created as provided by this section continue as long as the judgment, decree, or recognizance is in force or until it is satisfied or discharged.

**30.** D.C.Code § 15–311 provides in relevant part:

A writ of fieri facias issued from the United States District Court for the District of Columbia or the Superior Court of the District of Columbia upon a judgment entered in such court may be levied on all legal leasehold and freehold estates of the debtor in land, but only after such judgment has been filed and recorded in the office of the Recorder of Deeds of the District of Columbia.

the property by issuing writs of garnishment, before the District Court receiver was appointed, was critical to establishing the creditors' priority over the claims of the receiver. This question is important in determining how narrowly or broadly *Herman* is to be understood. Municipal Court involvement in *Herman*—issuance of writs of garnishment—was necessary for creation of the creditor's garnishment lien on the debtor's funds in the bank. In contrast, as explained above, no court is involved (beyond entry of the judgment itself) in creating a judgment lien on real estate, although the court, of course, may have to be involved in the judgment creditor's eventual enforcement of the lien.[31]

We believe that the Municipal Court's involvement was indispensable to creation of a judgment lien in *Herman* because the court's issuance of the garnishment writs, upon application, was essential to creation of the creditors' lien on the debtor's bank accounts; indeed, there was no other way of obtaining a judgment lien on those particular assets. But the fact that the court was essential to creation of the judgment lien on a bank account does not mean that the court is equally essential to creating judgment liens on other kinds of collateral. For example, a creditor's recording of a judgment lien with the Recorder of Deeds serves the same purpose, as a matter of law, as the court's issuance, accompanied by service, of a writ of garnishment on a garnishee; creation of a judgment lien through such recordation is no less complete than creation of a judgment lien through service of a court-issued garnishment writ. In fact, in either case, creation of the lien is initiated by interaction between the creditor (or its attorney) and the court's or Recorder's office staff; the transaction is ministerial, not discretionary. Thus, in the case of a garnishment, the court acts administratively; it does not perform a truly judicial function until it rules on a motion for judgment of recovery. Looked at in this way, the court's issuance of a writ of attachment or garnishment and the Record-

er's entry of a judgment on its record are similar acts to accomplish identical purposes.

In sum, the court's role under *Herman* was indispensable to creation of the particular kind of judgment lien at issue in that case, but a court's involvement is not necessarily required to create all judgment liens. We conclude the fundamental message of *Herman* is that the act of creating a judgment lien, whatever kind of action is required, is the critical act for determining whether a judgment lien creditor has priority over the claim of the debtor's receiver. If the creditor has obtained a judgment lien before a receiver is appointed for the debtor, *Herman* stands for the proposition that the lien creditor will prevail. *See Maxl Sales Co. v. Critiques, Inc.,* 796 F.2d 1293, 1297 n. 2 (10th Cir.1986) ("general rule of law is that appointment of a receiver does not determine any rights nor destroy any liens. The receiver merely becomes an assignee of the insolvent, having exactly the same rights that he [or she] had."); *Martin v. General Amer. Casualty Co.,* 226 La. 481, 76 So.2d 537, 541 (1954) ("a receiver cannot enjoin the execution of a judgment wherein the seizure occurred prior to his [or her] appointment"); *Kluckhuhn v. Ivy Hill Ass'n, Inc.,* 55 Md. App. 41, 461 A.2d 16, 20 (1983) ("A receiver takes property subject to claims that existed against it prior to the receivership."); *National Surety Corp. v. Sharpe,* 236 N.C. 35, 72 S.E.2d 109, 123 (1952) ("receiver takes the property of the insolvent debtor subject to the mortgages, judgments, and other liens existing at the time of his [or her] appointment"); *DeAngelis v. Commonwealth Land Title Ins. Co.,* 467 Pa. 410, 358 A.2d 53, 55 (1976) ("Having already shown that the aid of a receiver is extended only in behalf of creditors who have fully exhausted their remedy at law, it follows necessarily that the jurisdiction will not be exercised in favor of mere general creditors, whose rights rest only in contract and are not yet reduced to judgment, *and who have acquired no lien upon the property of the debtor*."); *First S. Prop-*

---

31. We deal here with two types of judgment liens: one by way of garnishment, the other by way of filing with the Recorder of Deeds. The former is sometimes referred to as a garnishment lien whereas the latter routinely is called a judg-

ment lien. Because the two judgment liens both legally and functionally accomplish the same purpose, we refer to each hereafter as a "judgment lien."

*erties, Inc. v. Vallone,* 533 S.W.2d 339, 343 (Tex.1976) ("a receivership destroys no prior vested right").[32]

We therefore turn to *Herman*'s application to the facts of this case.

### E. *Application of Herman v. Siney: Smith's Judgment of Recovery Against First American Bank*

We first consider Smith's judgment of recovery against First American Bank (Appeal No. 93–CV–61). Under *Herman,* if "[t]he receiver was appointed in a suit to which the [judgment creditor was] not [a party] and after the garnishment had been completed[,] ... [t]he appointment of a receiver ... [does] not divest the lien acquired by the garnishment." *Herman,* 190 A.2d at 652.

■ Smith served its first writ of attachment and interrogatories on First American on November 13, 1992, and the Delaware Chancery Court issued its Seizure and Injunction Order four days later, on November 17. Accordingly, the Delaware Chancery Court's Seizure and Injunction Order, which effectively appointed a receiver for CUIC, did not divest the lien Smith had already acquired through its November 13 attachment of funds held by First American.[33]

CUIC disputes the amount of money the trial court awarded to Smith in its judgment of recovery. CUIC contends that Smith's recovery should not exceed $319,423.62, in contrast with the $516,577.24 the court ordered, because First American's initial response to Smith's writ of attachment was limited to the smaller amount. CUIC argues that First American amended its answer to say it was holding $516,577.24 only because Smith obtained a second writ of attachment, which Smith served on the bank on December 8, after the Delaware Chancery Court had issued its Seizure and Injunction Order. According to CUIC, the difference in amounts between First American's first and second responses—$197,153.62—represents the amount that was subject to Smith's second writ of attachment, which does not have priority over CUIC's receiver because it was served after the receiver's appointment. CUIC therefore asserts that Smith's judgment of recovery should be reduced to $319,423.62 to exclude the additional $197,153.62 that First American added to its initial response.

It is possible—although Smith does not suggest—that the entire $516,577.24 was in CUIC's bank accounts at First American on

---

**32.** For purposes of applying *Herman,* there is another way of conceptualizing the situation in addition to an analysis that equates a creditor's recording of a judgment to obtain a lien on real estate with a court's issuance of a writ of garnishment. The fact is, these different acts required for obtaining judgment liens on different types of property are available to the creditor because—and only because—that creditor has a judgment in hand. The court already has acted in a way that permits instantaneous creation of a lien by a ministerial act initiated by the judgment creditor. Looked at from this perspective, where an indispensable basis for a lien is entry of the court's judgment, it is not a stretch to say that, by virtue of issuing the judgment itself, the court functionally has created the lien subject to a ministerial condition subsequent. Although the judgment lien, of course, does not legally attach until that ministerial act is accomplished—and thus the ministerial act is legally a condition precedent to creation of the lien—the judgment itself is the event fundamentally giving rise to the lien and thus can be said to reflect the court's presence at the creation of the lien. Simply put, a judgment lien is a two-part process—judgment and lien (either by writ of attachment or by recording)—and thus, for purposes of applying

*Herman,* the court is seized of the matter from the beginning of the process that secures the judgment debt. This concept of court control is enhanced by the fact that, as already indicated, procedures for enforcement of the judgment liens may require further direct court involvement.

**33.** Under *Herman,* CUIC's receiver is entitled to priority over all writs of attachment served after the Delaware court issued the Seizure and Injunction Order on November 17, 1992. *See Sunland Mortgage Corp. v. Lewis,* 515 So.2d 1337, 1339 (Fla.Dist.Ct.App.1987) ("Once property is placed under the control of the court through appointment of a receiver, no creditor may obtain preference by any lien rendered subsequent thereto even if the suit under which the judgment lien is acquired was commenced prior to the date of the order appointing the receiver."); 2 CLARK ON RECEIVERS § 622 ("[T]he appointment of a receiver does not invalidate liens which have previously attached to the defendant debtor's property. On the other hand, after a receiver has been appointed and has become validly in possession of the property, judgment creditors are not entitled to the property as against the receiver and cannot levy execution on such property.").

November 13, when Smith served its first writ of attachment on the bank, and that First American's initial response that it was holding $319,423.62 was merely an error, which it later attempted to correct by amending its response. Without regard to that possibility, Smith argues that the first writ, served on November 13, legally intercepted all funds that came into the seized accounts before entry of Smith's judgment of recovery against First American on January 5, 1993, even if they were not in the account on November 13, and, accordingly, that the court properly ordered judgment of recovery against First American in the amount of $516,577.24. Smith adds that it served the second writ of attachment and interrogatories on First American on December 8 merely "out of an abundance of caution in order to avoid any possible question as to Smith's entitlement to the additional funds."

We agree with CUIC that Smith's November 13 garnishment writ covers only those funds held by First American on November 13 and that any funds the bank received thereafter belong to CUIC's receiver, not to Smith—as elaborated below.

> After entry of a judgment,
>
> [a]n attachment shall be levied upon credits of the defendant, in the hands of a garnishee, by serving the garnishee with a copy of the writ of attachment and of the interrogatories accompanying the writ, and a notice that any property or credits of the defendant in his [or her] hands are seized by virtue of the attachment.

D.C.Code § 16–546. The garnishee must file an answer to the interrogatories in the writ and send a copy of the answer to the defendant and the judgment creditor. *See* D.C.Code § 16–552(a) (1989); Super.Ct.Civ.R. 69–I(d). After the garnishee answers the writ, the judgment creditor may file a motion for judgment of recovery, and a "judgment shall be entered against [the garnishee] for the amount of credits admitted or found, not exceeding the amount of the plaintiff's judgment, and costs, and execution shall be had thereon not to exceed the credits in his [or her] hands." D.C.Code § 16–556(a); *see also* Super.Ct.Civ.R. 69–I(e). This leaves the following question: Does a writ of attach-ment cover funds owed to the judgment debtor that come into the hands of the garnishee after service of the writ?

It appears that as a general rule, "apart from statutory provisions to the contrary," "an attachment or garnishment can have no effect on property subsequently coming into the hands of the defendant or garnishee." 6 AM.JUR.2d *Attachment and Garnishment* §§ 94, 461 (1966); *see Everson v. Atlas Tie Co.*, 73 Idaho 91, 92–93, 245 P.2d 773, 774–75 (1952) (only those debts owing at time of service of notice of garnishment are subject to garnishment, and debts arising by reason of subsequent transactions between garnishee and creditor are not bound by garnishment); *Dufield v. Davis*, 152 Kan. 404, 103 P.2d 778, 780 (1940) (attachment lien covers only actual interest of debtor in property existing at time of levy and does not extend to subsequently acquired interest); *Northwestern Nat'l Bank of Bloomington–Richfield v. Delta Studios, Inc.*, 289 Minn. 202, 184 N.W.2d 3, 4 (1971) (garnishment summons attaches and binds only personal property, money, or indebtedness owed defendant and in garnishee's possession at time summons is served); *Johnson v. Dutch Mill Dairy, Inc.*, 237 Minn. 117, 54 N.W.2d 1, 3 (1952) (deposits made in principal defendant's bank account after service of garnishment summons on bank were not impounded by such garnishment, but were subject to subsequent garnishment by defendant's creditors); *Holly v. Dayton View Terrace Improvement Corp.*, 25 Ohio Misc. 57, 53 O.O.2d 393, 263 N.E.2d 337, 342–43 (Ohio Ct.Com. Pleas 1970) ("it is also generally held that an attachment covers only the interest of the defendant in the property levied on existing at the time of the levy and that it does not extend to property previously transferred or to an interest in property subsequently acquired by the defendant").

"In some cases, however, usually by virtue of particular statutory provisions, a garnishment is regarded as binding effects or credits of the defendant coming into possession of or owning by the garnishee after service of the writ." 6 Am.Jur.2d *Attachment and Garnishment* § 461; *see International Bedding Co. v. Terminal Warehouse Co.*, 146 Md. 479,

126 A. 902, 905 (1924) (contrary to general rule, attachment in Maryland binds all property or credits of debtor in hands of garnishee or which may come into garnishee's hands after laying attachment and before trial); *Flat Iron Mac Assoc. v. Foley*, 90 Md.App. 281, 600 A.2d 1156, 1159–60 (1992) (writ of garnishment included property which came into garnishee's possession after service but prior to judgment); *Steer v. Dow*, 75 N.H. 95, 71 A. 217 (1908) (same).

■■■■■ We perceive no sound basis for rejecting the general rule and accordingly conclude that the District of Columbia follows that rule: a writ of garnishment covers only the property of the debtor in the hands of the garnishee at the time the writ is served.[34] Applying this ruling to the facts of this case, we conclude that the writ of garnishment Smith served on First American on November 13 covered only those funds that First American was holding for CUIC on that date.

Based on our review of the record, however, we cannot determine the amount of money that First American was holding for CUIC on November 13. The record does not reveal whether First American amended its response to Smith's writ of attachment because of an error in its first response or because additional funds were deposited into CUIC's accounts after its first response. We therefore cannot determine whether First American was holding $319,423.62 or $516,-577.24 on November 13; we must remand to the trial court for further proceedings to sort out Smith's proper recovery.

**F.** *Application of Herman v. Siney: Smith's Judgment Lien on CUIC's Connecticut Avenue Building*

We next consider Smith's judgment lien on the Connecticut Avenue building (Appeal No. 93–CV–726). CUIC contends that the trial court erred in granting summary judgment in favor of Smith and in ruling that (1) Smith had a valid, enforceable judgment lien on the building located at 1714 Connecticut Avenue, N.W. because CUIC's transfer of that building to its parent company, CUG, was a fraudulent conveyance and in ruling, further, that (2) Smith was entitled to pierce the corporate veil to execute on the building in CUG's hands. CUIC argues that there were genuine issues of material fact as to whether CUIC had fraudulent intent in transferring the building to CUG, and as to whether such fraudulent intent provided a sufficient basis for disregarding the corporate separateness of CUIC and CUG and thus permitting Smith to pierce the corporate veil.

**1.** *Summary Judgment Criteria*

■■■■■ Super.Ct.Civ.R. 56(c) (1993) requires the trial court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party—here Smith—has the burden of clearly demonstrating the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *See Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983). To survive a summary judgment motion, the opposing party—here CUIC—"need only show that there is sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Nader v. de Toledano*, 408 A.2d 31, 42 (D.C.1979) (quoting *International Underwriters, Inc. v. Boyle*, 365 A.2d 779, 782 (1976)). If the offered evidence and related inferences would permit the factfinder to find for the nonmoving party under the appropriate burden of proof, the motion for summary judg-

---

**34.** This does not include sums that may be held and earmarked for a debtor by the garnishee but are still subject to a contingency that has not occurred and thus has not assuredly made the money the debtor's own. *See Cummings Gen. Tire Co. v. Volpe Const. Co.*, 230 A.2d 712, 713 (D.C.1967) ("money payable upon a contingency or condition is not subject to garnishment until the contingency has happened or the condition

has been filled"); *see also United States Fidelity & Guar. Co. v. Wrenn*, 67 App.D.C. 94, 89 F.2d 838 (1937). On the other hand, the writ of garnishment will reach sums which the garnishee unconditionally owes to the debtor at the time the writ is served but which the garnishee has not yet posted to the debtor's account. *See Cummings*, 230 A.2d at 713; *Wrenn*, 67 App.D.C. at 96, 89 F.2d at 840.

ment must be denied. *See id.* Our standard of review of a trial court summary judgment order is the same as that applied by the trial court when it considers the motion in the first instance. *See Government Employees Ins. Co. v. Group Hosp. Medical Servs., Inc.,* 602 A.2d 1083, 1086 (D.C.1992); *Taylor v. Eureka Inv. Corp.,* 482 A.2d 354, 357 (D.C. 1984).

In granting summary judgment here, the trial court necessarily concluded as a matter of law that, on the facts seen in the light most favorable to CUIC, there were no genuine issues of material fact as to whether the transfer of the building was a fraudulent conveyance or whether Smith was entitled to pierce the corporate veil. We begin by examining the applicable legal principles.

## 2. *Fraudulent Conveyances: the Law*

"A conveyance or assignment ... of an estate or interest in land or its rents and profits ... with the intent to hinder or defraud persons having just claims or demands, of their lawful suits, damages, or demands, is void as against the persons so hindered or defrauded." D.C.Code § 28–3101 (1991); *see also J.R. Beaton Co. v. Berberich,* 77 U.S.App.D.C. 377, 378, 135 F.2d 831, 832 (1943) (vital question in determining whether debtor's conveyances are fraudulent is good faith of transaction). D.C.Code § 28–3101 also provides that "[t]his section does not affect the title of a purchaser for value, unless it appears that he [or she] had previous notice of the fraudulent intent of his [or her] immediate grantor."

According to D.C.Code § 28–3101, therefore, the transfer of CUIC's building to CUG was a fraudulent conveyance if (1) it was accomplished "with the intent to hinder or defraud" Smith in exercising its right of execution, and (2) either CUG was not a "purchaser for value" or CUG had "previous knowledge of the fraudulent intent" of CUIC.

## 3. *Fraudulent Conveyances: the Law Applied to the Facts of This Case*

■■■ The trial court concluded, based on undisputed facts of record and without holding a hearing,[35] that as a matter of law (1) "the conveyance was intended to hinder or defraud Smith of its right to execute on its judgment against CUIC;" (2) "CUG had notice of CUIC's fraudulent intent;" and (3) "even if CUG did not have notice of CUIC's fraudulent intent, CUG was not a purchaser for value of the building."[36] As elaborated below, the evidence in the record clearly supports the trial court's first two conclusions—that the conveyance was intended to hinder or defraud Smith and that CUG had notice of CUIC's fraudulent intent—and thus summary judgment on these two issues was appropriate. There was, however, a genuine issue of material fact as to the evidence surrounding the trial court's conclusion that CUG was not a purchaser for value of the building, and the trial court therefore erred in concluding to the contrary.[37] Nonetheless, because the trial court ruled correctly on the first two issues—CUIC's intent to defraud and CUG's notice of CUIC's fraudulent intent—and because those rulings together are sufficient to establish a fraudulent convey-

---

**35.** CUIC and Smith agreed that the issues scheduled to be addressed at the evidentiary hearing could be resolved by a ruling on Smith's motion for summary judgment, under applicable law and on the basis of the evidence of record and the evidence adduced in discovery. Thus, the parties mutually agreed that there was no need to hold the scheduled evidentiary hearing.

**36.** These statements read like findings of fact, but they are actually conclusions of law that there is no genuine issue of material fact as to their accuracy.

**37.** Although the trial court was correct in saying that, in exchange for the building, "CUG executed a promissory note with no down payment and no periodic payments," CUIC disputed Smith's contention that CUG was not a purchaser for

value, and this dispute created a genuine issue of material fact. CUIC contended, in its opposition to Smith's motion for summary judgment, that the building was worth approximately $1,650,-000, which was equivalent to the face value of the promissory note conveyed to CUIC by CUG, and that the CCSI stock pledged by CUG to guarantee the note was worth from $2 to $5 million. This evidence, viewed in the light most favorable to CUIC, does not support the trial court's understanding that CUG was not a purchaser for value. If CUG promised to pay the full fair market value of the building, and this promise was secured by a pledge of stock actually worth $2 to $5 million, then CUG clearly may have been a purchaser for value.

ance, the trial court's summary judgment was entirely proper.

■ In the first place, the trial court correctly concluded that CUIC had fraudulent intent within the meaning of the statute. "The question of fraudulent intent is a question of fact and not of law," D.C.Code § 28–3101; *see also Snider v. Kelly,* 77 U.S.App. D.C. 363, 364, 135 F.2d 817, 818 (1943), and appellate courts do not usually sustain grants of summary judgment on the issue of fraudulent intent. *See Estate of Lane v. Lane,* 631 P.2d 103, 106 (Alaska 1981); *Credit Union of Amer. v. Myers,* 234 Kan. 773, 676 P.2d 99, 106 (1984); *Farmers Prod. Credit Ass'n v. Taub,* 121 A.D.2d 681, 504 N.Y.S.2d 448, 449 (1986). Summary judgment on the issue of fraudulent intent may be appropriate, however, where all the facts "point[ ] to a finding of intent with no inference of a pure motive possible." *Jones v. Central Nat'l Bank of St. Johns,* 547 N.E.2d 887, 891 (Ind.Ct.App. 1989); *see also AYR Composition, Inc. v. Rosenberg,* 261 N.J.Super. 495, 619 A.2d 592 (App.Div.1993) (defendants' transfer of assets was fraudulent conveyance as matter of law, and summary judgment was appropriate where trial court's conclusion that defendants had fraudulent intent was based on analysis of facts in light of New Jersey statutory factors).

■ In evaluating claims of fraudulent intent, courts often discuss the "badges of fraud" in the case. *See Leonardo v. Leonardo,* 102 U.S.App.D.C. 119, 123, 251 F.2d 22, 26 (1958) ("the term 'badge of fraud' means any fact tending to throw suspicion upon the questioned transaction"); *Estate of Lane,* 631 P.2d at 106 (badges of fraud are "circumstantial evidence of intent"); *Jones,* 547 N.E.2d at 890 ("facts must be taken together to determine how many badges of fraud exist and if they constitute a pattern of

fraudulent intent"). The following "badges of fraud," among others, support the conclusion that a transferor had fraudulent intent: "[L]ack of consideration for the conveyance, a close relationship between the transferor and transferee, pendency or threat of litigation, financial difficulties of the transferor, and retention of the possession, control, or benefit of the property by the transferor." *Kelley v. Thomas Solvent Co.,* 725 F.Supp. 1446, 1457 (W.D.Mich.1988). Finally, under § 28–3101, creditors "must prove fraud as a matter of fact ... by clear and convincing evidence." *District–Realty Title Ins. Corp. v. Forman,* 518 A.2d 1004, 1008 (D.C.1986). Accordingly, our inquiry—regarding the trial court's conclusion that, as a matter of law CUIC had fraudulent intent—is whether the trial court correctly ruled that a reasonable jury could only conclude that the undisputed facts of record proved by clear and convincing evidence that CUIC had fraudulent intent in transferring its building to CUG. *See Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813, 816 (D.C.1991) ("A motion for summary judgment should be granted if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof.").

CUIC stated in its Opposition to Smith's Motion for Summary Judgment—and, as the trial court concluded, it is therefore undisputed—that CUIC had transferred its building to CUG in order to "protect[ ] its assets from attachment by Smith." CUIC contends, however, that it did not have fraudulent intent because the transfer was "the means to a non-fraudulent end: To preserve CUIC as a going concern to allow CUIC to fulfill its obligations to its policyholders and to all its creditors, including Smith." [38]

We conclude, as a matter of law, that the undisputed fact that CUIC transferred its

---

**38.** CUIC stated, more specifically, in its Opposition to Smith's Motion for Summary Judgment:
7. CUIC believed that it could avoid rehabilitation if it could protect its assets, including the Building, from attachment by Smith.
8. In order to preserve the assets of CUIC for the benefit of policyholders and creditors generally, CUIC entered into the Exchange with CUG.
9. CUIC believed that by protecting its assets from attachment by Smith, CUIC would gain

time during which CUG would be able to find a buyer for all or part of CUIC as a going business, or to sell CCSI and generate cash to improve CUIC's liquidity.

\* \* \* \* \* \*

4. Protecting the Building from an immediate attachment by Smith was not the object of the Exchange, but the means to a non-fraudulent end:

building to CUG to protect the building from Smith is clear and convincing evidence of CUIC's fraudulent intent. Although CUIC also may have had non-fraudulent motives— *i.e.*, CUIC may have wished to preserve its assets for the benefit of all its creditors—the simple fact that it transferred the building to keep it out of Smith's reach is a sufficient ground for an unassailable conclusion that CUIC had fraudulent intent. *See Kelley*, 725 F.Supp. at 1455 ("company's deliberate effort to put assets out of the reach of creditors meets the standard of intent to defraud"); *Klein v. Rossi*, 251 F.Supp. 1, 2 (E.D.N.Y. 1966) (fraudulent purpose includes a "solvent person's deliberate effort to stave off creditors by putting property beyond their reach even when the purpose of that is not to cheat them of ultimate payment but only to wrest from them time to restore the debtor's affairs").

Next, we conclude that the trial court's second conclusion—that CUG had notice of CUIC's fraudulent intent—was supported by undisputed record evidence that, as the trial court noted, "many of the people involved in the transfer of the building were officers in both CUIC and CUG." In its Opposition to Smith's Motion for Summary Judgment, CUIC did not dispute the fact that officers in both CUIC and CUG were involved in the transfer of the building. Instead, CUIC contended that "[s]ince CUIC's intent was not fraudulent, CUG cannot be said to have notice of any fraudulent intent of CUIC." This response effectively conceded CUG's notice of CUIC's intent, however legally characterized.

In sum, because the trial court correctly concluded as a matter of law, based on undisputed record evidence, that CUIC had fraudulent intent when it transferred its Connecticut Avenue building to CUG and, further, that CUG had notice of CUIC's fraudulent intent, we conclude that the trial court properly granted summary judgment in Smith's favor on the issue of the fraudulent conveyance.

Because we sustain the fraudulent conveyance ruling, we need not address the trial

To preserve CUIC as a going concern to allow CUIC to fulfill its obligations to its policyhold-

court's additional ruling that Smith could pierce the corporate veil to execute on the building in CUG's hands. The transfer to CUG was invalid, and thus ineffective. Smith may execute on the building in CUIC's, the judgment debtor's, hands. *See Tipp v. United Bank of Durango, Colorado*, 23 Ark.App. 176, 745 S.W.2d 141, 143 (1988) ("creditor of the grantor [may] elect[ ] to treat a fraudulent conveyance of the debtor's property as void, and institut[e] legal process to subject the property to his [or her] debt"); *Texas Sand Co. v. Shield*, 381 S.W.2d 48, 54 (Tex.1964) ("[W]hen the creditor obtains a judgment against the debtor, and properly records and indexes an abstract of such judgment, the creditor acquires a lien upon the land just as though no transfer had been made" if the conveyance is found to be fraudulent).

CUIC further contends, however, that the trial court erred in ruling that "Smith has a valid, enforceable judgment lien upon the building, dating from November 4, 1992," because the court should have given effect to the Delaware court's Seizure and Injunction Order and invalidated Smith's lien. For the reasons already discussed regarding priority of Smith's judgment of recovery vis-a-vis CUIC's receiver, we disagree. Smith obtained its judgment lien on the building on November 4, thirteen days before the Delaware court issued the November 17 Seizure and Injunction Order. We therefore conclude, under *Herman*, that "[t]he appointment of [CUIC's] receiver ... did not divest [Smith's judgment] lien." *Herman*, 190 A.2d at 652. Accordingly, as the trial court concluded, "Smith may enforce or foreclose upon the ... lien in partial satisfaction of its judgment."

### G. *Full Faith and Credit Clause Applied to the Facts of this Case: Required Court Permission under Huffines v. American Security & Trust Co. For Execution on Collateral Held by Judgment Lien Creditor Having Priority Over Delaware Receiver*

■ We have now resolved the "priority" issue. Specifically, we have concluded that

ers and to all its creditors, including Smith.

*Herman* gives Smith's judgment lien priority over the claims of the Delaware receiver, that a remand is required to sort out the amount of CUIC's funds that Smith may recover from the garnishee bank, and that, because there was a fraudulent conveyance of CUIC's Connecticut Avenue building to CUG, Smith may foreclose upon its lien on that building. We return now to the "permission" issue under *Huffines:* according to District of Columbia law, even a secured creditor must obtain permission from a receivership court to seize or sell the collateral. This suggests several questions.

Specifically, (1) does the Full Faith and Credit clause, as interpreted in *Clark I* and *Clark II,* require the judgment lien creditor (Smith) to apply for such permission from a receivership court in a foreign jurisdiction (Delaware), even though the receivership court predictably will deny permission and instead seize the property for the debtor's estate, contrary to what a receivership court in the District of Columbia would do under *Herman?* Or (2) does the Full Faith and Credit clause only require the judgment lien creditor (Smith) to seek permission from a District of Columbia court to take away the collateral, meaning that the District of Columbia court would assume the role of a hypothetical, ancillary receivership court limited to addressing the judgment lien creditor's (Smith's) request by applying whatever criteria a *Huffines* court—informed by *Herman*—would use to grant or delay (but not altogether refuse) permission? Or, finally, (3) does the Full Faith and Credit clause impose no limitation on the District of Columbia court's authority to grant permission for the judgment lien creditor (Smith) to take over the collateral immediately, under *Herman,* since the insurance company (CUIC) and its foreign (Delaware) receiver have not sought formal appointment of an ancillary, District of Columbia receiver?

As indicated earlier, we believe that *Clark I* and *Clark II* require the courts of this jurisdiction to recognize the status of the Delaware receiver, but to accord that receiver only the same rights and privileges against judgment lien creditors that the District of Columbia would accord a receiver appointed here. Under *Huffines,* the courts of this jurisdiction would allow the receiver, at most, to delay—but not deny—execution on judgment liens having priority under *Herman.*[39] Accordingly, Smith's postjudgment liens are entitled to priority over the claims of CUIC's Delaware receiver, but CUIC is entitled to insist that Smith must obtain court permission—meaning *Huffines*-type permission—before proceeding to enforce its liens.

The trial court granted Smith's motion for judgment of recovery for CUIC's funds held by First American and also ruled that "Smith may enforce or foreclose upon . . . its lien [on CUIC's Connecticut Avenue building] in partial satisfaction of [its] judgment." In doing so, however, the court ordered automatic—and immediate—enforcement of Smith's judgment liens applying *Herman*'s priority without addressing the entirely separate question of discretion, under *Huffines:* whether release of the collateral should be immediate or deferred.

In dealing with this issue it is important, first, to recognize that although, on the facts here, *Herman* gives Smith priority over the Delaware receiver, the bank accounts and building to which Smith is entitled are theoretically—by virtue of the Full Faith and Credit Clause, as interpreted in *Clark I* and *Clark II*—in the hands of a hypothetical receiver applying District of Columbia law under *Huffines.* We say "hypothetical receiver" to make clear that the Delaware receiver itself does not have jurisdiction over the property. If the District of Columbia, like Delaware, had adopted the UILA, *supra* note 24, the Delaware receiver "appointed in the state of the insurer's [CUIC's] domicile [would be] the successor to the company, and invested with title to all the assets of the company, wherever situated." 19A JOHN ALAN APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 10793 (1982) (foot-

---

**39.** *Huffines* dealt with consensual liens—deeds of trust—not judgment liens. While there theoretically may be contexts or arguments where this distinction has meaning, none has been asserted, and we perceive none, of relevance to this case. We believe that *Huffines* applies to judgment liens as to any other security interest.

note omitted). Because the District of Columbia, however, has not adopted the UILA and is therefore not a reciprocal state, the Delaware receiver is not vested with title to the assets of CUIC that are located in the District of Columbia. *See Dean Constr. Co. v. Agricultural Ins. Co.*, 22 A.D.2d 82, 254 N.Y.S.2d 196, 199 (1964) ("Because Empire [a Pennsylvania insurance company] is not, under the [UILA], domiciled in a reciprocal state ..., the Pennsylvania insurance commissioner is not vested by operation of law with title to Empire's New York property; nor, for that reason, may he sue to recover Empire's assets."). *Clark I* and *Clark II* made clear that, under the Full Faith and Credit Clause, the District of Columbia courts are required to give the Delaware receiver the benefit of the substantive law that would apply to a District of Columbia receiver, if appointed under the circumstances here as an ancillary receiver, vis-a-vis Smith's judgment liens; the Full Faith and Credit Clause does not require a District of Columbia court to defer to the jurisdiction of the foreign court or foreign receiver.

CUIC, in contending (incorrectly) that the Delaware receiver is seized of the collateral at issue here, did argue in the trial court as a fallback, reflecting a synthesis of *Clark I*, *Clark II*, and *Huffines*, that the trial court—in effect acting as a local, ancillary receiver—

should deny release of the collateral, without prejudice, to afford a "breathing spell" that might permit CUIC to "restructure its business in a way that allows it to address the claims of all policyholders and creditors, including Smith." [40] In other words, CUIC argued that if the Delaware court was not given jurisdiction over the collateral, with the right to apply Delaware law (UILA) granting the receiver, rather than Smith, priority over that collateral, then at least the District of Columbia trial court should exercise *Huffines*-type discretion to defer execution upon the collateral. The trial court rejected this argument, which CUIC preserved by noting an appeal.

In its brief on appeal, CUIC reiterates the argument that, under *Huffines*, the receivership court must exercise discretion when a judgment lien creditor seeks to enforce its liens against the debtor in receivership, even if the liens predate the receivership. But, rather than suggesting as a fallback—as it did in the trial court, see *supra* note 40—that the trial court itself should impose a *Huffines* stay, CUIC contends on appeal that, because under *Huffines* the receivership court itself has the right to control disposition of all liens, authority to enforce the landlord's judgment liens must be obtained from the Delaware receivership court.[41]

40. CUIC argued through the Delaware Insurance Commissioner, in the Commissioner's Opposition to the Motion of Smith for Judgment of Recovery, that

under the law of the District of Columbia in the case of receivership or similar proceedings involving insurance companies, even though a creditor may have a lien that arose before the proceeding was commenced, the creditor may not exercise dominion over the insurer's property without permission of the court with jurisdiction over the proceeding.

\* \* \* \* \* \*

The Insurance Commissioner believes that, if this court denies [Smith's] Motion for Recovery without prejudice and give the parties a breathing spell, CUIC may be able to restructure its business in a way that allows it to address the claims of all policyholders and creditors, including Smith, and thus eliminate the need for resolution of the difficult legal and policy issues presented by the Motion for Recovery.

41. CUIC argues in its reply brief on appeal:

The court in *Huffines v. American Security & Trust Co.*, 71 F.2d 345, 348, 63 U.S.App.D.C. 224 (1934) could not be clearer. If a receivership is created, the court that creates the receivership has control of any effort to foreclose on a pre-existing lien on the creditor's assets. "Only by permission of [court in the receivership case] could such a [foreclosure] sale be made." *Id.* 71 F.2d at 348. Smith, therefore, had and has the same right as any other lien holder to press its claim in the Delaware Chancery Court.

\* \* \* \* \* \*

In exercising jurisdiction over local assets a court may not deny a foreign receiver the same power over the local assets that a local receiver would have. If, as we have argued, *Huffines* establishes that in the case of an insurer, a local creditor may not foreclose on local assets without the authorization of the District of Columbia receivership court, then by reason of full faith and credit, the creditor may not foreclose on those assets without the authorization of the foreign receivership court. Hence, the existence of "local" assets does not

In making this argument, CUIC ignores the fact that *Huffines* dealt entirely with a conflict between a creditor and a receiver in the same jurisdiction; CUIC does not leave room for the possibility that *Herman*, not the UILA, applies and thus that Smith's claims will have priority, as a matter of law, over those of the Delaware receiver. On appeal, therefore, CUIC incorrectly contemplates the Delaware receiver's applying Delaware law—the UILA—rather than exercising *Huffines*-type discretion under District of Columbia law that recognizes a *Herman*-type priority here. We have already held, however, that *Herman's* rule of priority applies. Furthermore, *Herman* makes clear that the court first seized of the collateral is empowered to rule on the applicable lien priorities. See *supra* note 32. Finally, it would make no sense in any event to permit a Delaware receiver, not seized of the collateral, to apply District of Columbia law in this situation, especially when that law—as this litigation indicates—is not easily discernible and requires an exercise of discretion as a District of Columbia, not a Delaware, court would exercise it.

It is true that CUIC has appealed the trial court's refusal to grant a *Huffines*-type stay (No. 93–CV–61), but in now contending on appeal that the Delaware receivership court, not the trial court, should be responsible for the stay, see *supra* note 41, CUIC has abandoned its earlier, fallback position, see *supra* note 40, for which a notice of appeal had been filed.

Perhaps CUIC did so recognizing that the appeal period itself, in effect, has resulted in a *Huffines*-type stay and that the only purpose of the appeal, at this point, is to try in every way to convince this court that (1) the Delaware receivership court and the Delaware receiver—not the District of Columbia courts—should be awarded control of all CUIC's property in which Smith claims a judgment lien; that (2) Delaware's UILA rules, see *supra* note 24, granting the Delaware receiver's claims priority over Smith's judgment liens, should be applied; and that in any event (3) the law of the District of Columbia gives a foreign or local receiver

insulate the local court from the obligation of

priority over a judgment lien acquired before creation of the receivership. CUIC's efforts have failed.

## IV. CUIC's POLICY ARGUMENT FOR REJECTING HERMAN v. SINEY IN FAVOR OF ADOPTING PRINCIPLES OF UNIFORM INSURER LIQUIDATION ACT

CUIC contends that, as a matter of policy in interpreting District of Columbia common law, see *supra* note 27, this court should reject *Herman* and adopt the principles of Delaware law, specifically Delaware's version of the UILA, see *supra* note 24, which would give priority to CUIC's receiver over Smith's postjudgment liens. CUIC claims that the UILA was intended to provide "a comprehensive scheme to govern insurer insolvency, including the provisions for a stay (like the automatic stay under the United States Bankruptcy Code), during the pendency of delinquency proceedings in Delaware or in any 'reciprocal state.'" According to CUIC,

the Delaware Insurance Code provides that *any lien obtained ... within four months prior to the commencement of the delinquency proceedings shall be void* and that *any transfer of or lien on property of an insurer made or created within four months of the entry of an order to show cause and with intent to give any creditor a preference may be voided.*

(Emphasis added.) CUIC argues that we should give effect to this aspect of Delaware's insurance law and void Smith's postjudgment liens, since they were obtained within four months of the Delaware court's Seizure and Injunction Order.

We cannot agree. *See Martin*, 76 So.2d at 541–42 (provision of UILA—that liens obtained within four months of commencement of delinquency proceeding are void—"applies *only when the domiciliary state (in this case Texas) and the ancillary state (in this case Louisiana) are reciprocal states, as defined in*" the Louisiana statutes); *Dean Constr.*, 254 N.Y.S.2d at 198 ("the State of New York, by its adoption of the [UILA], in which it expressly confined to reciprocal states the operation of its common-law rule [that disso-

the full faith and credit doctrine.

lution of a foreign insurer served to abate all actions pending against it], effectively limited the rule's operation to such reciprocal states").

Putting aside the fact that *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971), binds this division of the court to apply *Herman*, and acknowledging that CUIC advances several important policy considerations in favor of its argument,[42] we would nonetheless decline to adopt those principles of Delaware law for the District of Columbia, because the legislature for the District has not adopted the UILA or its reciprocality provisions. It is true that, as of 1991, thirty jurisdictions had adopted some form of the UILA. Stephen W. Schwab et al., *Cross Border Insurance Insolvencies: The Search for a Forum Concursus*, 12 U.PA.J.INT'L BUS.L. 303, 310 (1991). But this very fact demonstrates that legislatures consider insurer liquidation policy to be their business.

### V. SUMMARY OF DISPOSITIONS

In sum, we (1) affirm the judgment upon the jury's verdict in favor of Smith, awarding damages in the amount of $2,500,000 for CUIC's breach of the lease; (2) affirm the trial court's denial of CUIC's motion for judgment notwithstanding the verdict; and (3) affirm the trial court's summary judgment in favor of Smith, invalidating the transfer of CUIC's Connecticut Avenue building to CUG and according Smith's claim priority under *Herman* over the Delaware receiver's claim to the building. We also (4) affirm, in principle, the trial court's judgment of recovery on Smith's November 13, 1992 writ of garnishment against First American Bank, but we remand the case to the trial court for a determination of the amount of money the bank was holding for CUIC on November 13, 1992, in order to limit any

judgment of recovery against First American to the correct amount.

*So ordered.*

---

**42.** CUIC argues that we should apply Delaware's insurance law in this case for the following policy reasons, among others: (1) deference to Delaware here will contribute to the orderly administration of insurer insolvencies nationwide; (2) it will aid the District of Columbia's governance of insurer insolvencies because other states will be more willing to cooperate with District of Columbia receivers in the future; (3) not applying Delaware law will discourage insurers from investing in the District of Columbia; (4) not applying Delaware law will cause a down-rating of the value of assets located outside the District held by insurers domiciled in the District; (5) not applying Delaware law will result in costs assessed against taxpayers, here and elsewhere, if CUIC is forced into liquidation.